**696**

RESERVATION RANCH, a California
partnership, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 94–403C.

United States Court of Federal Claims.

Oct. 22, 1997.

Kirk Johansen, Portland, OR, for plaintiff.

Lance J. Lerman, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger and David M. Cohen, Director, for defendant. Susan Cook, Environment and Natural Resources Division, United States Department of Justice and Laurie Ristino, United States Department of Agriculture, of counsel.

## OPINION

MEROW, Judge.

Plaintiff Reservation Ranch seeks $5,500,-000.00 from the United States for the cancellation of its timber sale contract. The U.S. Forest Service ("Forest Service") canceled that contract pursuant to a contract provision permitting cancellation and limiting compensation should the Chief of the Forest Service ("Chief") determine that harvesting the sale would be likely to jeopardize the continued existence of a threatened or endangered species, or cause an adverse impact to a sensitive species. This matter is now before the court following oral argument on cross-motions for summary judgment. The principal issues raised in those motions are whether the contract provision is valid and, if so, whether the Chief properly exercised the provision in this case.

Plaintiff argues that the Forest Service does not have the authority to adopt the species contract provision and compensation limitation at issue here. In particular, plaintiff maintains that the species contract provision conflicts with a Forest Service cancellation regulation which permits cancellation for broad environmental considerations, but which does not limit compensation as provid-

ed for in the contract, Plaintiff concludes that this purported conflict renders the species contract provision invalid, and that different contract terms consistent with the cancellation regulation should be applied to calculate compensation.

Plaintiff claims in the alternative that even if the contract provision is valid, the Chief improperly relied upon that provision to cancel the sale. Plaintiff advances two main arguments in support of this claim. First, plaintiff argues that the Chief does not have the authority under the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. §§ 1531–1543 (1994), to find jeopardy to the threatened northern spotted owl ("spotted owl" or "owl") in the face of a contrary U.S. Fish and Wildlife Service ("FWS") determination. Second, plaintiff argues that even if the Chief has the authority, his exercise of that authority in this case was arbitrary. In particular, plaintiff maintains that there is no evidence supporting the Chief's finding that harvesting timber in spotted owl habitat would likely jeopardize the continued existence of the owl. Plaintiff also claims that the Chief's reliance upon the cancellation regulation, with its broader measure of compensation, to cancel other timber sales in the region demonstrates that his invocation of the species contract provision here was arbitrary.

In view of these asserted deficiencies, and the purported absence of other legal authority independent from the ESA to protect the owl, plaintiff concludes that the Forest Service breached the contract.

Defendant argues that the prospectus for the timber sale and the contract unambiguously included several unique cancellation and compensation provisions not provided for in Forest Service regulations. Those provisions, according to defendant, properly apportioned between the parties the special risks relating to species preservation, and the experimental harvesting method called for in the contract. Defendant maintains that these clear terms of the contract do not conflict with Forest Service regulations, and must be enforced. Alternatively, defendant argues that even if the Forest Service regulation could be read to provide plaintiff with the right to the measure of compensation it

seeks, plaintiff waived that right when it entered into a contract which clearly provides otherwise.

It is decided that the challenged species contract provision is valid. As discussed more fully below, the Forest Service has the legal authority to adopt the species contract provision. Further, while the cancellation regulation prescribes the terms by which federal timber contracts may be unilaterally canceled by the government, it does not limit the ability of the parties to provide otherwise by contract. Finally, even if that regulation could be read to guarantee plaintiff the measure of compensation it seeks, plaintiff waived that measure by agreeing to a contract including a limitation on that compensation.

It is also decided that the Chief's exercise of the species contract provision was valid. The Forest Service has the legal authority under the ESA to determine that harvesting a timber sale in spotted owl habitat would likely jeopardize the continued existence of the owl, and the Chief's exercise of this authority here was not arbitrary. The purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species or threatened species depend may be conserved ...." 16 U.S.C. § 1531(b). This relationship between habitat preservation and species conservation in the case of the owl first came under Forest Service study in the 1970s. Since that time, each owl conservation strategy adopted by the agency has reflected this focus. The Forest Service's first owl conservation strategy directed that a portion of the area encompassing the sale be protected from harvesting, and formed the basis for the Forest Service finding that harvesting the sale would adversely affect the owl and its habitat. After that finding was made, a new owl conservation strategy directed that the preservation of additional habitat was necessary to avoid the owl's extinction, and placed a greater portion of the sale within a protected area. In view of this information, the Chief's finding here that harvesting the sale in spotted owl habitat would likely jeopardize the owl was not arbitrary.

Plaintiff's alternative claim that the Chief's reliance upon the cancellation regulation to cancel other timber sales demonstrates that the use of the species contract provision here was arbitrary also fails. Plaintiff affirmatively alleges that the other sales would have resulted in broad environmental harm. This allegation supports, rather than undermines, the cancellation of those sales pursuant to a regulatory provision allowing cancellation for broad impacts, and the invocation of the species provision in this case. Again, according to plaintiff's own argument, this sale was specifically designed to avoid those broad environmental impacts. In any event, the use of different cancellation authorities is one of form rather than substance since purchasers for all but one of the other sales agreed to exclude from their recovery the lost profits, replacement cost of timber and other anticipatory losses that plaintiff seeks to recover here.

Finally, contrary to plaintiff's contention, the Forest Service has not only the authority, but a legal duty independent from the ESA to consider the impact of the timber sale on the owl. Under the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 472a, 1600–1687 (1994), the Forest Service must maintain viable populations of the owl, a sensitive species under NFMA implementing regulations and policy. The species contract term at issue here reflected that duty by providing for cancellation if harvesting the sale would adversely impact a sensitive species. It is settled law that a cancellation based upon an erroneous ground may be sustained if there existed another adequate ground for the cancellation. Accordingly, even if there were some infirmity in the Chief's jeopardy determination, the cancellation may be sustained under the sensitive species clause of the cancellation provision based upon the Forest Service finding that the sale would adversely affect the owl.

The Forest Service is charged with managing the national forests in a manner which balances timber sales with its duty to protect threatened and endangered species. The contract term at issue here clearly reflected these requirements by providing that the timber sale could be canceled with compensa-

tion to the purchaser upon the Chief's determination that the balance should be struck in favor of wildlife. The Chief properly canceled the contract under that term when he determined that harvesting the timber sale within protected spotted owl habitat would likely jeopardize the continued existence of the threatened owl. Accordingly, defendant's motion for summary judgment is granted. Plaintiff's motion for summary judgment is denied. Plaintiff is entitled to compensation as provided for by the species cancellation and compensation provisions of the contract.

## FACTS

The Forest Service, an agency of the U.S. Department of Agriculture, manages 156 national forests occupying some 191 million acres, and is the largest federal landholding agency in the Pacific Northwest. Forest Service stewardship of this vast public resource is informed primarily by the Multiple–Use Sustained Yield Act of 1960, 16 U.S.C. §§ 528–532 (1994), NFMA and the ESA.

Together these statutes require the Forest Service to manage the national forests to "best meet the needs of the American people," 16 U.S.C. § 531(a), by insuring that its decisions reflect the recreational, timber production and fish and wildlife values of these forests. 16 U.S.C. § 529. The Forest Service implements this mandate pursuant to NFMA by preparing land and resource management plans for the forests which balance these competing values. 16 U.S.C. § 1604(a). While these management plans may provide for Forest Service sales of national forest timber, 16 U.S.C. §§ 472a, 1604(i), the Forest Service must insure that the forests support a "diversity of plant and animal communities." 16 U.S.C. § 1604(g)(3)(B). Where a proposed timber sale would be likely to jeopardize the continued existence of a threatened or endangered species, harvesting must yield to species conservation. 16 U.S.C. § 1536(a)(2).

## I. The POC Timber Sale Contract

NFMA authorizes the Forest Service to sell timber from national forests, and directs that contract terms shall promote orderly

harvesting consistent with the different resource values of the forests, including fish and wildlife resources. 16 U.S.C. §§ 472a, 1604. The Forest Service initiates timber sales through advertisement, and offers prospective purchasers a prospectus describing the terms of sale. 16 U.S.C. § 472a(b); 36 C.F.R. § 223.82–83 (1996).

On July 26, 1990, the Forest Service advertised the sale of approximately 1,160 thousand board feet of timber from Six Rivers National Forest, Gasquet Ranger District, California. The sale, termed the POC Aerial Salvage Timber Sale ("POC sale" or "sale"), was designed to enable the Forest Service to study a new harvesting method it anticipated would reduce the environmental impacts of ground-based logging requiring road construction. The new method consisted of an aircraft propulsion unit mounted on a frame suspended from a natural-shaped balloon, or "neutral buoyancy aircraft." Plaintiff was the sole bidder on the POC sale, and was awarded the contract on November 5, 1990.

The 13 page written portion of the POC sale prospectus contained several provisions related to threatened and endangered species, as well as several provisions relating specifically to the spotted owl. The most important of those provisions notified bidders that spotted owls were thought to occupy the sale area, that the contract might be canceled in the event that the owl was listed as threatened or endangered under the ESA, and that the contract would include a provision limiting purchaser compensation should the Chief cancel the contract based upon a finding that harvesting the sale would either jeopardize the continued existence of a threatened or endangered species, or adversely impact a sensitive species. Def. Summ. J. Ex. at 212 (prospectus notifying bidders that provision C8.2 and C9.52 would be included in the contract and providing text).

Most importantly, the prospectus notified bidders that should the contract be canceled

for these reasons, there would be no recovery of lost profits, the replacement cost of timber or any other anticipatory losses. *Id.*

The POC sale contract contained an index of the special provisions noted in the prospectus, again calling attention to the provision dealing with cancellation based upon species concerns and limiting compensation for such cancellations.[1] Def. Summ. J. Ex. at 228. As noted in the prospectus, provision C8.2 was included in the POC sale contract. It provided:

C8.2—Termination. (12/89) The Chief, Forest Service, by written notice, may terminate this contract, in whole or in part, (1) to comply with a court order, regardless of whether this sale is named in such an order, upon a determination that the order would be applicable to the conditions existing on this sale; or (2) upon a determination that the continuation of all or part of this contract would:

(a) cause serious environmental degradation or resource damage;

(b) be significantly inconsistent with land management plans adopted or revised in accordance with Section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended;

(c) cause serious damage to cultural resources pursuant to C6.24;

*(d) jeopardize the continued existence of Federally listed threatened and endangered species or, cause unacceptable adverse impacts on sensitive species, identified by the appropriate Regional Forester.*

Compensation for termination under this provision shall be calculated pursuant to C9.5, except; compensation for termination under (1) shall be calculated pursuant to C9.51 when included in this contract, and compensation for termination under

---

1. In addition to the provision challenged in this case, the prospectus and the contract provided for the adjustment of the contract term should award be delayed because of the listing of the spotted owl under the ESA, or any lawsuit filed relating to the owl. C8.213—Delay of Award (5/89). Both documents also provided for a limited operating period based upon the owl's mating season. C6.313B—Limiting Operating Period (1/84). Further, the contract allowed the Forest Service to modify the contract to incorporate special protective measures related to species preservation. C6.25—Protection of Habitat of Endangered Species (10/78).

(2)(d) shall be calculated pursuant to C9.52 when included in this contract.

Def. Summ. J. Ex. at 303 (emphasis added).

Contract provisions C9.5, C9.51 and C9.52 were included in the POC contract. *Id.* at 311–12. Contract provision C9.5 allows for the largest measure of purchaser compensation for cancellation, while contract provision C9.52 and C9.51 provide more limited measures. Provision C9.5 reads:

> Settlement—(10/77). If this contract is terminated by Forest Service under C8.2, Purchaser agrees that the liability of the United States shall be limited to the sum of (1) the value of unused Purchaser Credit; (2) the estimated expenditures for felling, bucking, lopping, skidding, and decking any products so processed, but not removed from Sale Area because of the termination action; (3) out-of-pocket expenses involved in acquiring and holding the contract such as maintaining performance bonds and cash deposits, and (4) the difference between (a) Current Contract rates for the remaining uncut volume, and (b) the rates paid for comparable timber on the same National Forest during the preceding 6-month period multiplied times the remaining uncut volume.

*Id.*

By contrast with C9.5, contract provision C9.52, applicable to contract cancellations based upon species considerations, limited recovery to those costs set out in subsection (1), (2) and (3) of C9.5, explicitly noting that "out-of-pocket expenses in (3) do not include lost profits, replacement cost of timber or any other anticipatory losses suffered by Purchaser." Provision C9.51, applicable to contract cancellations mandated by court order, further limited compensation to those costs set out in subsection (1) and (2) of C9.5; that is, were the contract canceled to comply with a court order, the purchaser would receive neither lost profits, replacement cost of timber or other anticipatory losses, nor out-of-pocket expenses. *Id.*

At the same time, the prospectus and the contract contained provisions relieving the purchaser of liability for failure to perform due to problems with the neutral buoyancy aircraft. Def. Summ. J. Ex. at 211, 304–05, 310–11 (contract provisions C8.223, C8.224 and C9.42).

## II. Protection of the Northern Spotted Owl

The northern spotted owl lives in the forested regions of western Oregon, Washington and northwestern California, largely in old growth forest stands in national forests. Studies conducted by the Forest Service in the early 1970s first linked old growth forests slated for sale with the owl, and recognized that such sales could adversely affect the species. By 1973, concern over the loss of old growth prompted federal and state authorities to issue the first in a series of recommendations to set aside old growth in order to preserve habitat for the owl. Over the more than two decades since, the debate over the habitat needs of the owl and the logging of national forests has occupied the attention Forest Service biologists, political leaders and the federal courts.[2]

### a. The National Forest Management Act

The Forest Service implements its NFMA mandate to protect a diversity of plant and animal communities through regulation and agency policy. In particular, the Forest Service is required to maintain "viable populations" of wildlife in national forests. 36 C.F.R. § 219.19. In order to maintain wildlife viability, the Forest Service must insure that habitat exists to support "at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area." *Id.* The Forest Service performs biological evaluations to insure, among other things, that its actions "do not contribute to loss of viability" of a species. Forest Service Manual ("FSM"), Title

---

**2.** *See generally* Steven L. Yaffee, *Lessons About Leadership from the History of the Spotted Owl* *Controversy,* 35 Nat. Resources J. 381 (1995).

2600, Wildlife, Fish, and Sensitive Plant Habitat Management § 2672.41(1) (1995).

The Forest Service sensitive species policy is designed to promote the conservation of species where viability is in doubt. FSM § 2670.32. A sensitive species is defined as:

Those plant and animal species identified by a Regional Forester for which population viability is a concern, as evidenced by: a. Significant current or predicted downward trends in population numbers or density. b. Significant current or predicted downward trends in habitat capability that would reduce a species' existing distribution.

FSM § 2670.5(19). The northern spotted owl is a sensitive species, FSM § 2672.24a. Ex. 01 at 16, and was so designated by the Regional Forester in the region encompassing the sale in 1978. FSM § 2633.4 (1978).

A January 21, 1981 Forest Service directive from the Regional Forester in that region to Forest Supervisors informed Supervisors that:

The spotted owl has been designated by the Regional Forester as a sensitive species. Under the direction of FSM 2670, sensitive species 'will receive special management . . . to prevent their placement on Federal lists' (2670.3(1)); will require habitat protection and protection of 'individual organisms from harm or harassment' (2670.3(2)). The NFMA Planning regulations (36 C.F.R. Part 219) state that: 'Fish and wildlife habitats will be managed to maintain viable populations of all existing native vertebrate species. . . .'

United States Department of Agriculture, Forest Service, Region Five, *Spotted Owl: Land and Resource Management Standards and Guidelines,* January 21, 1981 ("Region 5 Directive"). The Regional Forester concluded by directing Supervisors to "plan for management of National Forest lands to provide for the continued viability of this species." *Id.*

In 1984, pursuant to its NFMA duty, the Forest Service released formal guidelines prescribing a management strategy designed to maintain viable owl populations. That strategy called for the preservation of a network of spotted owl habitat areas ("SOHAs") throughout the national forests designed to meet the habitat needs of a small number of owl breeding pairs by preserving an area of suitable habitat, and established a minimum number of owl pairs that would represent a viable population. A portion of the POC sale was located within a SOHA. Def. Summ. J. Ex. at 349.

After challenges by both timber companies and environmentalists, the Forest Service re-evaluated the strategy. The resulting Forest Service management strategy for maintaining viable owl populations was again challenged as insufficient to maintain viability, and led to injunctions halting many timber sales scheduled in the Pacific Northwest. *Seattle Audubon Soc'y v. Robertson,* No. C89–16–WD (W.D.Wash. Mar. 24, 1989) (order on preliminary injunction).

The *Seattle Audubon* suit prompted a response from Congress, popularly known as the "Northwest Timber Compromise." That compromise, contained in section 318 of the Department of the Interior and Related Agencies Appropriations Act for Fiscal Year 1990, Pub.L. No. 101–121, § 318, 103 Stat. 701, 745–50 (1989), deemed the timber sales that were the subject of the *Seattle Audubon* suit to be in compliance with the environmental laws that formed the basis for the challenge.[3] The compromise also directed the Forest Service to prepare a new spotted owl plan by September 30, 1990, incorporating the recommendations of the Interagency Scientific Committee ("ISC").

The ISC, a scientific committee led by Forest Service biologists charged with developing a new strategy for maintaining viable owl populations, issued its report in April 1990. In it, the ISC found that:

the owl is imperiled over significant portions of its range because of continuing losses of habitat from logging and natural

---

**3.** In *Seattle Audubon Soc'y v. Robertson,* 914 F.2d 1311, 1315 (9th Cir.1990), the Ninth Circuit struck this section on the grounds that it violated the principle of separation of powers by directing the result in pending litigation. The Supreme Court reversed. *Robertson v. Seattle Audubon Soc'y,* 503 U.S. 429, 441, 112 S.Ct. 1407, 1414–15, 118 L.Ed.2d 73 (1992).

disturbances. Current management strategies are inadequate to ensure its viability. Moreover, in some portions of the owl's range, few options for managing habitat remain open, and available alternatives are steadily declining throughout the bird's range. For these reasons, delay in implementing a conservation strategy cannot be justified on the basis of inadequate knowledge.

Report of the Interagency Scientific Committee to Address the Conservation of the Northern Spotted Owl, *A Conservation Strategy for the Northern Spotted Owl* ("ISC Report") (USDA 1990) at 1. The ISC concluded that the Forest Service SOHA strategy was "a prescription for the extinction of spotted owls." *Id.* at 39.

Based upon this conclusion, the ISC recommended abandoning the SOHA strategy in favor of protecting larger blocks of habitat, dubbed "Habitat Conservation Areas" ("HCAs"). *Id.* The ISC found that large blocks of habitat capable of supporting multiple pairs of owls placed closely enough to enable dispersal and mating of owls between blocks would be more likely to insure a viable owl population. *Id.* While only part of the POC sale had fallen within a SOHA, under this more aggressive strategy more of the area encompassing the POC sale fell within a protected HCA. Def. Summ. J. Ex. at 387–88. Under the ISC recommendations, no harvesting, including the harvesting of dead and dying timber, was to occur in HCAs. ISC Report at 4, 325.

On September 28, 1990, the Forest Service indicated that it was abandoning its SOHA strategy, and stated that it would manage timber sales in a manner "not inconsistent with" the ISC recommendations. Northern Spotted Owl Habitat Management, Vacation of Northern Spotted Owl Guidance, 55 Fed. Reg. 40,413 (October 3, 1990). The planning of additional sales was again enjoined, however, pending the Forest Service's fulfillment its NFMA duty to insure that those sales could proceed without threatening the viability of owl populations. *Seattle Audubon Soc'y v. Evans,* 771 F.Supp. 1081, 1086 (W.D.Wash.), *aff'd,* 952 F.2d 297 (9th Cir. 1991).

In that challenge, the Ninth Circuit rejected the Forest Service argument that it was relieved of its NFMA duty to plan for the owl's viability once the species was listed under the ESA. The court made clear that the requirements of the ESA and NFMA are independent and concurrent; accordingly, compliance with the ESA did not abrogate the Forest Service's NFMA duty to maintain viable owl populations. *Seattle Audubon,* 952 F.2d at 301–03.

### b. The Endangered Species Act

At the same time that the Forest Service sought to prepare a conservation strategy to insure the viability owl populations under NFMA, the FWS was petitioned to list the owl as a threatened or endangered species under the ESA. *See* 16 U.S.C. § 1533(b)(3)(A); 5 U.S.C. § 553(e) (1994). The initial FWS decision to reject the petition to list was challenged, and found to be arbitrary and capricious. *Northern Spotted Owl v. Hodel,* 716 F.Supp. 479 (W.D.Wash. 1988). Upon reevaluation, the FWS reversed itself, and proposed to list the owl as a threatened species. Endangered and Threatened Wildlife and Plants; Proposed Threatened Status for the Northern Spotted Owl, 54 Fed.Reg. 26,666 (June 23, 1989).

The FWS proposal to list the spotted owl triggered the ESA requirement that the Forest Service confer with the FWS concerning the effect that harvesting the POC sale would have on the owl. 50 C.F.R. § 402.10 (1996). The ESA informal conference procedure for a species proposed for listing assists federal agencies in identifying potential future conflicts between its activities and species concerns, should the species later be listed. *See* 50 C.F.R. § 402.10(a). If the species is later listed as threatened or endangered under the ESA, the federal agency is required to review its action to determine if further ESA requirements must be met. 50 C.F.R. § 402.10(c).

Pursuant to Forest Service policy, the agency prepares a biological evaluation to determine how a proposed action, including a timber sale, will affect species both proposed for listing under the ESA, or any species identified by the agency as sensitive under

NFMA.[4] FSM § 2672.41. Biological evaluations serve as the basis for viability determinations concerning sensitive species under NFMA. FSM § 2672.41(1).

Consistent with this requirement, the Forest Service conducted a biological evaluation of the POC sale under the then-applicable SOHA strategy. In that evaluation, Forest Service biologists found that the portion of the sale within the SOHA was occupied owl habitat, that very little suitable habitat remained in the Gasquet District of Six Rivers National Forest, and that this area of the sale provided a key link in the network of SOHAs, thereby facilitating owl dispersal and mating among protected areas in the region. With respect to harvesting in such an area, the biologists found that:

> [t]he proposed sale essentially targets soon-to-be-dead standing timber. The number and condition of snags and downed logs are important components of suitable spotted owl habitat. Snags provide food, cover, and nest substrates for a variety of small mammal and bird species used as prey by the spotted owl.

Def. Summ. J. Ex. at 352. Snags are dead standing trees. ISC Report at 422. The biologists concluded that harvesting such timber would further reduce snag densities below levels needed to maintain the suitability of that habitat for owls. Def. Summ. J. Ex. at 352. Based upon these factors, the Forest Service concluded that the portion of the POC sale within the SOHA was "likely to adversely affect spotted owls and suitable habitat," *id.* at 353, and requested a FWS conference on the sale.

The FWS issued an informal conference report on the POC sale and the Forest Service biological evaluation on November 8, 1989. In it, the FWS discounted the Forest Service concern that the sale would destroy suitable spotted owl habitat based on the rationale that this habitat was "expected to become unsuitable in 1–2 years as trees continue to die." Plf. Summ. J. Ex. at 59. This FWS rationale was not responsive to the Forest Service concern, however, since that concern was premised on the view that dead timber was necessary to maintain the suitability of habitat.

In its report, the FWS nonetheless recognized the importance of such habitat by recommending that Forest Service funds be expended to add snags and downed trees after harvest to replace the lost habitat. *Id.* The FWS also recognized the importance of this habitat in its definition of suitable spotted owl habitat:

> The age of the forest is not as important a factor in determining habitat suitability as are vegetational or *structural components.* Suitable owl habitat has moderate to high canopy closure (60 to 80 percent); a multi-layered, multi-species canopy dominated by large (> 30 inches in diameter at breast height (dbh)) overstory trees; a high incidence of large trees with various deformities (e.g., large cavities, broken tops, dwarf-mistletoe infections, and other evidence of decadence); *numerous large snags; large accumulations of fallen trees and other woody debris on the ground;* and sufficient open space below the canopy for owls to fly.

Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Northern Spotted Owl, 55 Fed.Reg. 26,114, 26,116 (June 26, 1990) (emphasis added). Based in part upon the premise that the replacement of such habitat would occur, the FWS concluded that the portion of the POC sale in the SOHA would not adversely affect the owl. *Id.*

On June 22, 1990, the FWS listed the owl as threatened under the ESA.[5] *Id.* The

---

4. More specifically, the Forest Service prepares biological evaluations pursuant an agency policy which envisions that the biological evaluation will be used as a tool to insure compliance with both the ESA and NFMA. FSM § 2672.41. Forest Service biological evaluations may be relied upon by the agency to comply with the ESA requirement that it prepare a "biological assessment" when the agency proposes or authorizes major construction activities that may impact a proposed or listed threatened or endangered species. *See* 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(b)(1).

5. A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). An endangered species is "any species which is in danger of extinction throughout all or a signif-

FWS failure to designate critical habitat for the owl at the time of listing was challenged and found to be arbitrary and capricious. The FWS was ordered to prepare and submit a critical habitat plan. *Northern Spotted Owl v. Lujan,* 758 F.Supp. 621, 629 (W.D.Wash.1991).

The owl's listing under the ESA guaranteed it new protections distinct from those afforded by NFMA. The ESA provides for the conservation of threatened and endangered species, and the habitat upon which they depend, 16 U.S.C. § 1531(b), by prescribing that all necessary means be taken to insure both the survival and recovery of the species to the point where the statute's protections are no longer necessary. 16 U.S.C. § 1532(3). Those protections include the prohibition of the taking (*e.g.* kill, harm, harass) of any threatened or endangered species. 16 U.S.C. §§ 1532(19), 1538(a)(1)(B). This take prohibition applies to any person and any act that harms a threatened or endangered species, including habitat modification which has this effect.[6] 50 C.F.R. § 17.3; *see also Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 698, 115 S.Ct. 2407, 2413, 132 L.Ed.2d 597 (1995). A person found to have knowingly violated this prohibition faces both civil and criminal penalties. 16 U.S.C. § 1540(a)-(b).

Those protections also include the requirement that federal agencies like the Forest Service insure, after consulting with the FWS, that its actions are not likely to place the continued existence of a threatened or endangered species in jeopardy. 16 U.S.C. § 1536(a)(2). The ESA specifically provides:

> Each Federal agency shall, in consultation with and with the assistance of the ... [FWS], insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species....

*Id.* This consultation process culminates in a FWS jeopardy or no jeopardy determination supported by a FWS biological opinion. The FWS will reach a jeopardy finding if it determines that the federal action "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."[7] 50 C.F.R. § 402.02.

After considering the FWS opinion, the Forest Service retains the ultimate authority to decide whether to offer the sale in light of its ESA obligation to insure that its action is not likely to cause jeopardy. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.15(a).

Within a week of the owl's listing, the Forest Service requested that the FWS prepare a biological opinion on the POC sale. In the request, the Forest Service noted that its biologists had concluded that harvesting the sale would adversely affect the owl and its habitat. The FWS issued a 14 page biological opinion less than a month later, covering not only the POC sale, but 43 other fiscal year 1990 timber sales in Six Rivers National Forest. Def. Summ. J. Ex. at 384–97. The biological opinion treated those 44 sales collectively and, in contrast to the For-

---

icant portion of its range...." 16 U.S.C. § 1532(6). Generally, a threatened species is afforded the same protection under the ESA as an endangered species. *See* 16 U.S.C. § 1533(d); 50 C.F.R. § 17.31(a) (1996).

6. By permit, however, the FWS may allow an otherwise prohibited take to occur so long as "such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). An applicant for a so-called "incidental take permit" must prepare a conservation plan identifying the steps that will be taken to minimize and mitigate impacts to the species. The permit application and plan are subject to public comment, and may be

revoked if the terms are not complied with by the applicant. *See* 16 U.S.C. § 1539(a)(2).

7. If the FWS reaches a jeopardy finding, it will attempt to develop reasonable and prudent alternatives ("RPAs") to the proposed action which would avoid causing jeopardy. 16 U.S.C. § 1536(b)(3)(A). If RPAs are both available, and the applicant agrees to implement those RPAs by modifying the proposed action, that action may generally proceed without running afoul of the ESA. *See generally* Oliver A. Houck, *The Endangered Species Act and its Implementation by the U.S. Departments of Interior and Commerce,* 64 U. Colo. L.Rev. 277 (1993).

est Service biological evaluation, did not contain a specific analysis of the POC sale. The opinion did, however, denote that the POC sale was located within a protected HCA occupied by spotted owls. *Id.* at 388.

In the general discussion of the timber sales, the FWS recognized that the ISC had concluded that in order to protect the viability of the owl population, no harvesting, including the harvesting dead and dying timber, should occur in protected areas. *Id.* at 387. The FWS also explicitly found that "some northern spotted owls will be adversely impacted" by the sales, and that the ISC recommendations "will not be completely implemented if the timber sales proceed as proposed." *Id.* at 391. Although this general discussion further reflected the FWS view that dead and dying timber are necessary components of suitable owl habitat, providing nesting sites and supporting the owl's prey, a chart in the biological opinion denoted that the harvest of such timber under the POC sale would not render the area unsuitable as owl habitat. *Id.* at 388.

While acknowledging the soundness of the ISC strategy, and its finding that then-current management practices would not prevent the owl's extinction, the FWS nonetheless concluded that none of the 44 sales continuing such practices, including the POC sale, would jeopardize the continued existence of the owl. *Id.* at 391.

At the same time, the FWS declined to include the area encompassing the POC sale within the critical habitat designation for the spotted owl. "Critical habitat" comprises those areas that the FWS determines possess the physical or biological features that are essential to the listed species conservation, and which need special management or protection to serve that function. 16 U.S.C. § 1532(5)(A). The FWS is required to designate this habitat at the time of listing if such habitat is discernable on the basis of the best scientific information available, 16 U.S.C. § 1533(a)(3), after considering several factors, including the economic impact of the designation. 16 U.S.C. § 1533(b)(2).

In the critical habitat designation for the spotted owl, the FWS excluded all timber sales sold and awarded as of August 13, 1991, because in its view the market value of such sales exceeded the benefits of halting the sales. Endangered and Threatened Wildlife and Plants; Determination of Critical Habitat for the Northern Spotted Owl, 57 Fed. Reg. 1,796, 1,808 (January 15, 1992) (codified at 50 C.F.R. pt. 17).

In the designation the FWS noted, however, that the ISC recommendations were the best available conservation strategy for maintaining viable owl populations, that the critical habitat designation did not replace the HCA network, and that federal agencies should follow the ISC recommendations in HCAs. *Id.* at 1,812; *see also* Endangered and Threatened Wildlife and Plants, Revised Proposed Determination of Critical Habitat for the Northern Spotted Owl, 56 Fed.Reg. 40,002, 40,012 (August 13, 1991) ("Critical habitat offers additional protection ... but it does not replace the HCA network and management recommendations.... Critical habitat will help to retain options until long-term conservation plans are accepted and fully implemented.").

### III. Cancellation of the POC Timber Sale

On October 5, 1990, Northcoast Environmental Center ("NEC") sought to enjoin the Forest Service from proceeding with a number of timber sales, including the POC sale, on the ground that the sales were planned in HCAs contrary to the ISC Report. *Northcoast Environmental Ctr. v. Barker*, Civ. No. S–90–1250–EJG (E.D. Calif.1990). The Forest Service settled that suit on January 31, 1991. The settlement order provided:

The Forest Service will terminate the contracts for the following six sales: Mini, Resalvage, *POC Aerial* ..., Tomcat, Cotton, and Wilson. These sales will not be offered or re-offered. If any location covered by these sales is to be proposed for logging in the future, such proposed logging will proceed under entirely new planning and documentation. The Forest Service acknowledges that intervenors with canceled sales are entitled to their out-of-pocket expenses on any canceled contracts. Intervenors agree that they will limit their claims for expenses or damages on these contracts to out-of-pocket expenses in-

volved in acquiring and holding the contract such as maintaining performance bonds and cash deposits. *Out–of–pocket expenses do not include lost profits, replacement cost of timber or any other anticipatory losses suffered by Purchasers.*

Plf. Summ. J. Ex. at 82 (emphasis added).

All of the six canceled timber sale contracts included both species provision C8.2(2)(d) and the court order provision C8.2(1), and the corresponding compensation limitations.[8] Of the six canceled sales, four purchasers agreed to limit their compensation as provided above. Because the settlement order provided for the recovery of out-of-pocket expenses, the compensation measure applied to those claims was larger than that which would have been applied had the Forest Service exercised the court order provision of C8.2(1). Minimum Impact Logging did not agree to settle, and was ultimately awarded compensation calculated pursuant to the larger measure found in Forest Service regulation 36 C.F.R. § 223.116(a)(5). Section 223.116(a)(5) provides that a timber sale contract may be canceled:

> Upon determination by the Chief, Forest Service, that operations thereunder would result in serious environmental degradation or resource damage and with reasonable compensation to the purchaser for unrecovered costs incurred under the contract and the difference between the current contract value and average value of comparable National Forest timber sold during the preceding 6-month period.

Since this regulation provides for the recovery of replacement cost of timber on a con-

tract canceled to avoid broad environmental harm, it affords a greater measure of compensation than the POC sale contract provisions related specifically to species preservation and court-ordered cancellation.

By a July 8, 1992 letter to plaintiff, the Chief canceled the POC sale:

> I am canceling the POC Aerial Timber Sale ... in accordance with Special Provision C8.2—Termination, upon my determination that operations thereunder would jeopardize the continued existence of a Federally–listed threatened ... species. Specifically, this sale is being canceled because it is located within northern spotted owl habitat. The northern spotted owl is listed as threatened under the Endangered Species Act (See 8.2(2)(d)). Compensation to the purchaser for this contract will be provided as a stated in Special Provision C9.52.

Def. Summ. J. Ex. at 340.[9]

Plaintiff filed a claim with the Forest Service seeking $4,780,000.00 in compensation on September 2, 1992. In that claim, plaintiff alleged that contract provisions C8.2(2)(d) (species cancellation provision), C9.51 (compensation calculation for court-ordered cancellation) and C9.52 (compensation calculation for species related cancellation) were invalid. The claim was later amended to increase the compensation sought to $5,500,-000.00. The contracting officer rendered his decision on June 23, 1993.

Although the contracting officer acknowledged in his decision that the POC sale was canceled pursuant to the species clause, he

---

**8.** The Tomcat sale, however, did not include the C9.51 compensation limitation.

**9.** Plaintiff claims that this determination is a "nullity," arguing that only the Regional Forester, not the Chief, had the authority under the contract to make the jeopardy determination. While it is true that contract compensation provision C9.52 gives the Regional Forester the authority to find jeopardy, this does not diminish the Chief's authority to do so under species cancellation provision C8.2(2)(d).

Plaintiff's alternative claim that C8.2(2)(d) actually requires the Regional Forester make the jeopardy determination, Plf. Rep. Br. at 17 n. 18, is not supported by the language of the provision.

The reference to the Regional Forester in that clause is limited to the Regional Forester's duty to identify sensitive species under NFMA and the Forest Service sensitive species policy, and indicates that the clause will only apply to species so listed. As noted earlier, the Regional Forester in the region encompassing the POC sale had designated the northern spotted owl a sensitive species, thereby bringing this clause of C8.2(2)(d) into play here. This reference in C8.2(2)(d) does not, however, place the authority to make the jeopardy or adverse impact finding in the Regional Forester. Accordingly, plaintiff's argument that the Chief's determination is void under the rationale of *New York Shipbuilding Corp. v. United States,* 180 Ct.Cl. 446, 385 F.2d 427 (1967), is rejected.

found that compensation should be governed by the larger measure of C9.5. The contracting officer's sole basis for this conclusion was that Minimum Impact Logging had received essentially this measure of compensation pursuant to 36 C.F.R. § 223.116(a)(5). Plf. Summ. J. Ex. at 109. Disagreeing with plaintiff's appraisal under C9.5 of $5,500,-000.00, however, the contracting officer limited the award to $63,721.00. Plf. Summ. J. Ex. at 115. Plaintiff refused that award, and filed this action on June 21, 1994.

## ANALYSIS

■ The Contracts Disputes Act ("CDA"), 41 U.S.C. §§ 601–613 (1994), applies to any express or implied contract entered into by an executive branch agency for the procurement of goods, services or disposal of personal property. 41 U.S.C. § 602(a). A timber sale contract is a contract for the disposal of personal property within the meaning of the CDA. *Mendenhall v. Kusicko,* 857 F.2d 1378, 1379 (9th Cir.1988) (per curiam). After receiving the contracting officer's decision on a claim, the contractor may file a direct action on that claim before this court, 41 U.S.C. § 609(a)(1), which has jurisdiction to hear disputes arising under such contracts, "including disputes concerning contract termination, rights in property ... and other non-monetary disputes on which a contracting officer has issued a decision." *Janicki Logging Co. v. Mateer,* 42 F.3d 561, 564–65 (9th Cir.1994) (citing the Tucker Act, 28 U.S.C. § 1491(a)(2) (1994)).

Both plaintiff and defendant have moved for summary judgment, arguing that no genuine issues of material fact surround the resolution of plaintiff's claim under the POC contract, and that judgment may therefore be entered as a matter of law. RCFC 56(c). A dispute over a material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this case, since defendant's motion is granted, defendant is considered the moving party and plaintiff is considered the non-moving party.

The moving party bears the initial burden of demonstrating the absence of all genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). In the case where the non-moving party bears the burden of proof at trial, the moving party can meet its initial burden by showing that there is an absence of evidence in the record necessary to prove an element of the non-moving party's case. *See id.* at 323, 106 S.Ct. at 2552–53. Once the moving party has made a sufficient showing, the burden shifts to the non-moving party to present facts evidencing a reasonable dispute to any material factual issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). While a material factual dispute must be viewed in a light most favorable to the non-moving party, that party must nonetheless "do more than simply show that there is some metaphysical doubt as to the material facts" in order to defeat a motion for summary judgment. *Id.*

## I. Validity of the Species Contract Provision

Plaintiff claims that the Forest Service does not have the authority to adopt species contract provision C8.2(2)(d) permitting cancellation for species concerns, and limiting compensation for such cancellation pursuant to C9.52. In particular, plaintiff argues that this provision is invalid because it is purportedly inconsistent with Forest Service cancellation regulation 36 C.F.R. § 223.116(a)(5). Plaintiff maintains that this regulation, which permits cancellation for "serious environmental degradation or resource damage," but which does not limit compensation as provided by species contract provision C8.2(2)(d), exclusively governs such cancellations. Plaintiff maintains that neither NFMA, nor the regulation, give the Forest Service the discretion to contract to different terms.

### a. Authority to Adopt the Species Contract Provision

■ Forest management statutes do not speak directly to the question of adopting specific contract terms providing for the cancellation of timber contracts when species concerns prove paramount to harvesting.

Where a statute is silent on the specific issue at hand, the agency interpretation of its statutory authority regarding that issue will be sustained if its interpretation is a permissible one. *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Accordingly, the Forest Service's use of the species contract provision will be upheld if supported by a permissible reading of the statute. *See Fort Sumter Tours, Inc. v. Babbitt,* 66 F.3d 1324, 1330 (4th Cir.1995) (applying *Chevron* to find agency adoption of contract provision allowing for unilateral readjustment of fees charged under National Park concession contract valid). This deferential standard, however, is bounded by the proposition that "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987) (quoting *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981)).

■ As noted above, NFMA directs the Forest Service to implement its timber sale program in a manner which promotes orderly harvesting consistent with the different values of the national forests, including fish and wildlife resources. 16 U.S.C. §§ 472a, 1604. While the Forest Service must balance timber production, recreation and fish and wildlife values in discharging this duty, 16 U.S.C. § 529, NFMA provides that the management of any given area may protect one resource value to the exclusion of another value. *See* 16 U.S.C. § 531(a) (recognizing that in managing national forests "some land will be used for less than all of the resources"). In view of this authority, the Forest Service's adoption of a contract term which provides that species considerations may preempt harvesting is a permissible implementation of its statutory charge to manage the timber program in a manner which insures the maintenance of wildlife diversity. *See* 16 U.S.C. §§ 529, 531(a), 472a(c), 1604(g)(3)(B).

Plaintiff's argument that the Forest Service "effectively concede[s]" that the species

provision is invalid in statements regarding its regulatory agenda, *see* Disposal of National Forest Timber; Cancellation of National Forest Timber Sale Contracts, 61 Fed.Reg. 68,690 (December 30, 1996), 59 Fed.Reg. 57,025 (November 14, 1994), if correct, could arguably trigger a less deferential standard under the rationale of *Cardoza–Fonseca.* The statements cited by plaintiff, however, reflect the Forest Service view that under the current form of the regulation, the agency faces uncertain liability for contract cancellations undertaken in order to comply with a variety of environmental laws. These references cannot be fairly read as an express or implied concession that species contract provision C8.2(2)(d) and its compensation limitation are invalid and unenforceable.

Plaintiff similarly mischaracterizes a General Accounting Office report. In the report cited by plaintiff, the GAO estimates that the potential future liability of the Forest Service for timber sale contract cancellations may rise to as high as $259,000,000.00, and explicitly acknowledges that the accuracy of this figure depends, in part, upon the validity of species contract provision at issue here. United States General Accounting Office, *Timber Management: Opportunities to Limit Future Liability for Suspended or Canceled Timber Sale Contracts* 6 (1996). It also does not reflect a Forest Service concession that the species provision is invalid.

This is not a case where Congress has limited the discretion of an agency to contract. *See American Tel. and Tel. Co. v. United States,* 124 F.3d 1471, 1477 (Fed.Cir. 1997); *cf. American Airlines, Inc. v. Austin,* 75 F.3d 1535, 1541 (Fed.Cir.1996) (airline ticket refund restriction proscribed by statute may not be enforced against United States). Here, Congress left the implementation of NFMA's direction to manage national forests in a manner which maintains wildlife diversity to the discretion of the Forest Service. Species contract provision C8.2(2)(d) and its compensation limitation is a permissible implementation of that statutory charge.

#### b. Contract Terms that Vary Regulatory Provisions

■ Plaintiff argues in the alternative that even if the Forest Service has the authority

to adopt the species contract provision and compensation limitation, it restricted that authority by the promulgation of 36 C.F.R. § 223.116(a). According to plaintiff, this regulation prescribes the exclusive reasons for which the Forest Service may cancel timber contracts, and sets forth the sole measure of compensation for such cancellations.[10] Contrary to this contention, while the Forest Service regulation may prescribe the exclusive circumstances under which the Forest Service may unilaterally cancel timber sale contracts, it does not limit the ability of the parties to contract otherwise. *Peters v. United States,* 694 F.2d 687, 692–96 (Fed.Cir. 1982); *see also Firestone Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21, 35, 444 F.2d 547, 554 (1971) (regulation prescribing price escalation term in government contracts does not supplant price escalation contract term); *Hartford Accident & Indem. Co. v. United States,* 130 Ct.Cl. 490, 491, 127 F.Supp. 565, 566 (Ct.Cl.1955) (regulation which would not render plaintiff liable for liquidated damages does not supplant contract term rendering plaintiff liable for such damages).

In the above mentioned *Peters* case, the proposition advanced by plaintiff was raised and definitively rejected by the Federal Circuit. There, the plaintiff entered into a timber sale contract providing for helicopter harvesting. The parties later entered into a written modification providing that the plaintiff would be permitted to harvest with cheaper conventional methods, and that the Forest Service would receive a rate increase applied retroactively to timber harvested before the modification. 694 F.2d at 690–91. The plaintiff then challenged the agreement, arguing that the Forest Service lacked the authority to enter into the modification on the ground that the modification conflicted with two Forest Service regulations. The first regulation prescribed four grounds for rate increases, none of which embraced changing harvesting methods.[11] *Id.* at 692. The second regulation proscribed the retro-

---

10. Cancellation regulation 36 C.F.R. § 223.116 in its entirety provides:

"(a) Timber sale contracts and permits may be canceled:

(1) For serious or continued violation of their terms.

(2) Upon application, or with the consent of the purchaser, when such action is of advantage to the United States or not prejudicial to its interests.

(3) Upon application of the purchaser if the value of the timber remaining to be cut is diminished materially because of catastrophic damage caused by forces beyond the control of the purchaser resulting in (i) physical change in the sale area or access to it, or (ii) damage to timber remaining to be cut.

(4) For conviction of violation of criminal statutes or, following final agency or judicial determination, of violation of civil standards, orders, permits, or others [sic] regulations for the protection of environmental quality issued by a Federal agency, State agency, or political subdivision thereof, in the conduct of operations thereunder, on National Forest System land, unless compliance with such laws or regulations would preclude performance of other contractual requirements.

(5) Upon determination by the Chief, Forest Service, that operations thereunder would result in serious environmental degradation or resource damage and with reasonable compensation to the purchaser for unrecovered costs incurred under the contract and the difference between the current contract value and aver-

age value of comparable National Forest timber sold during the preceding 6—month period.

(b) Cancellation will be by the Chief, Forest Service. Authority to cancel contracts under (a)(1) through (4) of this section may be delegated to Regional Foresters for sales within their authorization. All other contract cancellations under paragraph (a)(5) of this section shall be by the Chief, Forest Service, whose decision shall be the final agency decision."

11. The Forest Service regulation at issue in *Peters* provided that:

"Timber may be appraised and sold at a lump-sum value or at a rate per unit of measure which rate may be adjusted during the period of the contract and as therein specified in accordance with formulas or other equivalent specifications for the following reasons: (1) variations in lumber or other product value indices between the price index base specified in the contract and the price index actually experienced during the cutting of the timber; (2) variance between advertised rates and rates redetermined by appraisal at dates specified in the contract; (3) variance between redetermined rates and rates appropriate for changes in costs or selling values subsequent to the rate redetermination which reduce conversion value to less than such redetermined rates; and (4) substantial loss of value due to physical deterioration of green timber."

36 C.F.R. § 221.7(e) (1975).

active application of modifications.[12] *Id.* at 696.

The Federal Circuit rejected the plaintiff's claim that these regulations rendered the modification agreement invalid, finding that the regulations only prescribed the circumstances in which the Forest Service could unilaterally impose rate increases and retroactive modifications. The court held that, notwithstanding regulations evincing exclusivity, the parties could agree to different terms. *Id.* at 692–96.

The instant case falls well within holding in *Peters* since, unlike the regulations at issue there, 36 C.F.R. § 223.116 contains permissive language reflecting the flexibility to contract to different terms. For example, while the rate increase regulation at issue *Peters* was written in exclusive terms, the cancellation regulation at issue here is not. Subsection (a)(2) of 36 C.F.R. § 223.116 provides that timber contracts may be canceled "[u]pon application, or with the consent of the purchaser, when such action is of advantage to the United States or not prejudicial to its interests." That is, the cancellation regulation specifies that the parties may provide for cancellation for reasons not specifically enumerated. Further, subsection (a)(5) of 36 C.F.R. § 223.116 is not written as an exclusive statement on cancellation and compensation for environmental considerations, unlike the prohibitive modification regulation in *Peters.*

Plaintiff's reliance upon *Everett Plywood Corp. v. United States,* 227 Ct.Cl. 415, 651 F.2d 723 (1981), for the proposition that the Forest Service regulation must be applied in this case is misplaced. In *Everett Plywood,* the Forest Service unilaterally canceled a timber sale contract for environmental reasons. Neither the contract, nor Forest Service regulations in effect at the time, howev-

er, provided for such cancellations. *Id.,* 651 F.2d at 728. On these facts, the Federal Circuit found that the Forest Service breached the contract, and applied the subsequently enacted Forest Service cancellation regulation to calculate compensation. *Id.* at 728–32; *see also Peters,* 694 F.2d at 692. Here, the contract did prescribe the relevant cancellation and compensation terms, rendering *Everett Plywood* inapposite.

Congress has not restricted the discretion of the Forest Service to adopt a contract term allowing for cancellation and limited compensation for species considerations. Nor has the Forest Service done so by the promulgation of 36 C.F.R. § 223.116. Accordingly, it is concluded that contract provision C8.2(2)(d) permitting cancellation for species considerations, and limiting compensation pursuant to C9.52, is valid.[13]

### c. *Waiver of Regulatory Provisions*

Lacking an affirmative prohibition by Congress, it is well settled that a party may waive statutory and Constitutional rights. *E.g., Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 848, 106 S.Ct. 3245, 3255, 92 L.Ed.2d 675 (1986) (contractual waiver of due process rights); *Seaboard Lumber Co. v. United States,* 903 F.2d 1560, 1563 (Fed.Cir.1990) (contractual waiver to jury trial); *Do–Well Mach. Shop, Inc. v. United States,* 870 F.2d 637, 641 (Fed.Cir. 1989) (contract provision limiting statutory right to present termination of convenience claim upheld on waiver grounds); *see also Burnside–Ott Aviation Training Ctr. v. Dalton,* 107 F.3d 854, 858–59 (Fed.Cir.1997) (statutory proscription of waiver); *OSHCO–PAE–SOMC v. United States,* 16 Cl.Ct. 614, 619 (1989) (same). Although it is decided that the cancellation regulation is not the exclusive provision governing cancellation

---

**12.** The Forest Service regulation governing modifications provided that: "Timber sale contracts may be modified only when the modification will apply to unexecuted portions of the contract and will not be injurious to the United States. Modifications permitted by this section may be made by the officer approving the sale, by his successor, or by his superior." 36 C.F.R. § 221.16(a) (1975).

**13.** Plaintiff cites 36 C.F.R. § 223.40 as additional support for its argument. Section 223.40 provides that timber contracts longer than two years shall include several provisions, including the term reflected in 223.116(a)(5). Although this additional regulatory provision does not change the analysis employed here, it should be noted that the referenced provision does not apply in any case because the POC sale contract had a term of less than two years.

and compensation for environmental considerations, even if the regulation were susceptible to this interpretation, plaintiff waived that compensation measure when it agreed to the contract containing the species term and compensation limitation.

Plaintiff argues against this result on the ground that it did not intentionally relinquish a known right. In *Seaboard Lumber,* however, the Federal Circuit explained that waiver may be implied from a party's acceptance of contract provisions:

> Waiver can be either express or implied. Waiver requires only that the party waiving such right do so 'voluntarily' and 'knowingly' based on the facts of the case. The acceptance of contract provisions providing for dispute resolution in a forum where there is no entitlement to a jury trial may satisfy the 'voluntary' and 'knowing' standard.

903 F.2d at 1563 (internal citations omitted).

Again, plaintiff's argument against waiver was raised and rejected by the Federal Circuit in *Peters.* Although the plaintiff in that case did not have actual knowledge of the regulations at issue, and therefore could not form a specific intent to waive them, the court nonetheless charged the plaintiff with the requisite knowledge. *Peters,* 694 F.2d at 696 (citing *Federal Crop Insur. Corp. v. Merrill,* 332 U.S. 380, 385, 68 S.Ct. 1, 3–4, 92 L.Ed. 10 (1947)). The court, relying upon waiver as an independent ground to uphold the modification, concluded that "Peters was aware that the modification agreement covered all timber under contract, including that already cut, yet he voluntarily signed the agreement. He cannot now complain because the agreement was retroactive." *Id.*

Unlike the plaintiff in *Peters,* plaintiff here does not claim that it lacked actual knowledge of the Forest Service regulation. Instead, plaintiff's timber manager with primary responsibility for the POC sale attests that plaintiff did not intend to waive 36 C.F.R. § 223.116, and that plaintiff did not

press the applicability of the regulation in view of the species contract provision based on the belief that it was powerless to negotiate the issue.[14] This claim was raised and rejected in *Do–Well:* "The United States can enforce the waiver of, or agreement to, a given limitations period with the same force as a private party, notwithstanding its superior bargaining power." 870 F.2d at 641.

█ Plaintiff here was aware that the contract included special provisions relating to species preservation, and that the sale area was occupied by spotted owls. Accordingly, even if 36 C.F.R. 223.116(a)(5) could be read as an exclusive statement on cancellation and compensation for environmental considerations, plaintiff waived that provision when it agreed to the POC contract with its species term and compensation limitation. *See, e.g., Madigan v. Hobin Lumber Co.,* 986 F.2d 1401, 1403 (Fed.Cir.1993) (contracting parties must be held to their agreement).

## II. Forest Service Exercise of the Species Contract Provision

Plaintiff alternatively claims that even if the species contract provision is valid, the Chief improperly relied upon that provision to cancel the POC sale. Plaintiff advances two main arguments in support of this claim. First, plaintiff argues that the Forest Service does not have the legal authority under the ESA to find jeopardy to the owl in the face of a contrary FWS opinion. Second, even if the Forest Service has the legal authority, plaintiff argues that this authority was arbitrarily exercised here. In particular, plaintiff claims that there is no evidence to support the Chief's finding that harvesting within owl habitat would likely cause jeopardy to the owl. Plaintiff also claims that the Chief's reliance upon the cancellation regulation to cancel other timber sales subject to the NEC order demonstrates that his invocation of the species contract provision here was arbitrary.

---

14. Plaintiff claims that the POC contract was one of adhesion, and that it was powerless to negotiate the elimination of the species clause. Plaintiff cites no support for this proposition, or reason to depart from precedent. *Seaboard Lumber,*

903 F.2d at 1564 ("[t]he bare fact that the contracts in question are 'take it or leave it' offers by the government is not controlling upon the ... provision's validity").

### a. Forest Service ESA Authority

Plaintiff's first contention challenging the Forest Service's ESA authority fails under the plain language of the statute. The Forest Service, not the FWS, retained the ultimate authority under the ESA to decide whether to go forward with the POC sale. 16 U.S.C. § 1536(a)(2) ("[e]ach *Federal agency* shall ... insure ... [its actions are] not likely to jeopardize the continued existence of any endangered species or threatened species....") (emphasis added); *see also* 50 C.F.R. § 402.15 ("Following the issuance of a biological opinion, the *federal agency* shall determine whether and in what manner to proceed with the action in light of its section 7 obligations and the Service's biological opinion.") (emphasis added).[15]

■ As the case law plaintiff cites for support also makes clear, the obligation to insure that federal actions do not jeopardize the continued existence of threatened or endangered species is a substantive one that runs to the agency proposing to take the action. In particular, the Forest Service has:

> an independent duty to ensure that any action it authorizes, funds, or carries out does not jeopardize the continued existence of any endangered or threatened species.... The purpose of consultation is to allow the agency to utilize the expertise of the FWS in assessing the impact of the proposed project.... Consultation is not an end in itself, but merely the means to reach a reasoned decision.

*Lone Rock Timber Co. v. United States Dep't of Interior*, 842 F.Supp. 433, 440 (D.Or.1994). Accordingly, consultation with the FWS does not conclusively establish an agency's compliance with its substantive obligation to insure that its action is not likely to cause jeopardy, and an agency which proceeds with its action in reliance upon a FWS no jeopardy finding may still be found to have acted arbitrarily. *Resources Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1304–05 (9th Cir.1994) (Forest Service

decision to proceed with action in reliance upon FWS no jeopardy determination held to be arbitrary and capricious); *see also Pyramid Lake Paiute Tribe v. United States Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir.1990) ("[a] federal agency cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species; its decision to rely on a FWS biological opinion must not have been arbitrary or capricious").

Plaintiff alternatively argues that the FWS biological opinion is nonetheless effectively determinative of the issue of jeopardy because an agency which acts contrary to a FWS *jeopardy* determination "will almost certainly be found to have acted ... contrary to law." *Lone Rock Timber*, 842 F.Supp. at 437. Plaintiff's reliance upon this proposition is misplaced because the rationale underlying it is not implicated where, as here, the agency acts contrary to a FWS *no jeopardy* determination.

The Supreme Court's recent explanation of the rationale underlying this proposition, and cited for support by plaintiff, exposes the error. In *Bennett v. Spear*, —— U.S. ——, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), irrigators sought to challenge a FWS biological opinion finding that the Bureau of Land Management's ("BLM") operation of a large irrigation project was likely to jeopardize the continued existence of two endangered species of fish. Arguing that the irrigators lacked standing, the FWS maintained that the injury of reduced water flows was not traceable to the FWS jeopardy finding since the BLM retained the authority under the ESA to decide whether or not to reduce water flows for irrigation.

While acknowledging that BLM retained this final authority under the ESA, the Court rejected the FWS argument on the ground that, as a practical matter, the jeopardy determination was "virtually determinative" of the ultimate BLM decision. *Id.* at ——, 117 S.Ct. at 1165. FWS jeopardy determinations have this effect, the Court explained, because

---

15. Further, the ESA places affirmative conservation obligations on federal agencies, requiring agencies to review their programs and "utilize such programs in furtherance of the purposes of [the Act]" and to "utilize their authorities in furtherance of the purposes of [the Act] by carry-

ing out programs for the conservation of endangered species and threatened species." 16 U.S.C. § 1536(a)(1). These provisions of the ESA give the Forest Service the general authority to promote the conservation of the spotted owl.

an agency which acts contrary to one runs the risk of violating the ESA, either by failing to insure against jeopardy, or by taking a threatened or endangered species.[16] *Id.*

This rationale does not apply, however, where the agency acts contrary to a FWS *no jeopardy* determination by finding jeopardy and canceling its proposed action. In such a case, the agency no longer runs the risk of violating the ESA. *See id.* at ——, 117 S.Ct. at 1164 (qualifying the analysis by noting that it is a "[a] Biological Opinion of the sort rendered here" *i.e.*, one finding jeopardy, "that alters the legal regime to which the action agency is subject"). Quite apart from indicating a violation of the statute, the Chief's cancellation of the action which triggered consultation brings that particular ESA inquiry to an end since the agency is no longer proposing to take an action which may cause jeopardy.[17] *See* 16 U.S.C. § 1536(a)(2) (federal agencies shall insure that "any *action* authorized, funded, or carried out by such agency" is not likely to cause jeopardy) (emphasis added).

### b. Forest Service Jeopardy Determination

Plaintiff claims in the alternative that even if the Forest Service has the legal authority under the ESA to find jeopardy, this authority was arbitrarily exercised by the Chief. Plaintiff raises two main arguments in support of this claim. First, plaintiff alleges that there is no evidence to support the Chief's finding that harvesting a sale located in spotted owl habitat would jeopardize the continued existence of the owl. According to

plaintiff, this evidentiary void, particularly when viewed in light of the contrary FWS determination, establishes that the Chief's determination was arbitrary. Second, plaintiff argues that the Chief's reliance upon the cancellation regulation to cancel other timber sales subject to the NEC order supports the inference that the Chief's reliance upon the species contract provision here was arbitrary.

### i. Scope of Review

The POC sale contract specifies that disputes are to be governed by the CDA, 41 U.S.C. §§ 601–613, which provides that review of the contracting officer's determination is *de novo*. 41 U.S.C. § 605(a). Accordingly, the court owes no deference to the findings made by the contracting officer in this case. *E.g., Assurance Co. v. United States*, 813 F.2d 1202, 1206 (Fed.Cir.1987). Although plaintiff has recognized that the Chief's jeopardy determination is properly reviewed under an arbitrary and capricious standard, Plf. Mot. Summ. J. at 23, 32; Plf. Reply at 28–29; Hr'g Mot. Summ. J. Tr. at 14, it argued in its post-hearing brief that this CDA term requires the court to review the Chief's jeopardy determination *de novo*. Plf. Supp. Br. at 1–3.

■ Contrary to this contention, when the parties to a contract vest one party with the discretion to make a critical factual determination under the contract, this court narrowly reviews that determination to ascertain whether that discretion was arbitrarily or capriciously exercised. *E.g., Thomas Creek*

---

**16.** In *Bennett,* the FWS did, however, identify alternatives to BLM's plans which would have allowed the agency to operate the project without jeopardizing the fish. *Bennett,* —— U.S. at —— ——, 117 S.Ct. at 1159–60. As noted earlier, *see supra* n. 7, when the FWS reaches a jeopardy determination, it will attempt to develop alternatives to the proposed action which would avoid jeopardy. Many FWS jeopardy findings do identify such alternatives, allowing the action to proceed with modification. *See generally* United States General Accounting Office, *Endangered Species Act: Types and Number of Implementing Actions* (1992).

**17.** Plaintiff's claim that the Chief violated 50 C.F.R. § 402.16 when he canceled the sale without first reinitiating consultation with the FWS

fails for the same reason. The regulatory requirement to reinitiate consultation is implicated where the federal agency is proposing to act in the face of information indicating a possibility of harm to the species not considered in a previous consultation. *See, e.g., Sierra Club v. Marsh,* 816 F.2d 1376 (9th Cir.1987) (applying 50 C.F.R. § 402.16). Again, by canceling the sale, the Chief was no longer proposing to take an action for which consultation was required and, accordingly, 50 C.F.R. § 402.16 was not implicated by that cancellation. In any event, the Chief here was acting on information that was considered by the FWS in preparing its biological opinion, and thus was not "new" information within the meaning of the regulation. *See* 50 C.F.R. § 402.16(b).

*Lumber & Log Co. v. United States,* 32 Fed. Cl. 787, 790 (1995) (" 'a party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously' ") (quoting *Pacific Far East Line, Inc. v. United States,* 184 Ct.Cl. 169, 184, 394 F.2d 990, 998 (1968)), *aff'd,* 73 F.3d 379 (Fed.Cir.1995); *Fort Sumter Tours,* 66 F.3d at 1331 (agency's unilateral change of rates charged under National Park concession contract governed by arbitrary and capricious standard); *Everett Plywood Corp. v. United States,* 206 Ct.Cl. 244, 256–57, 512 F.2d 1082, 1090 (1975); *County of Suffolk v. United States,* 26 Cl.Ct. 924, 926–27 (1992) (finding analogous contract language gave EPA the discretion to make critical factual determination under contract and compelled review under arbitrary and capricious standard); *Town of Fallsburg v. United States,* 22 Cl.Ct. 633, 641–42 (1991) (same); *see also Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 417, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971) (describing limited circumstances under which APA authorizes *de novo* review of agency decision making).

Under this narrow scope of review, the court does not weigh evidence relating to the agency determination or substitute its judgment for that of the agency, but rather considers whether the agency has " 'articulate[d] a rational relationship between the facts found and the choice made.' " *Harris v. United States,* 19 F.3d 1090, 1096 (5th Cir. 1994) (reviewing agency wetland determination) (quoting *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983)).

The absence of formal findings by the Chief here does not impede this review. *See Overton Park,* 401 U.S. at 417, 91 S.Ct. at 824. In *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam), the Supreme Court found that judicial review of a brief agency denial may be had by reviewing the materials available at the time of decision. In *Camp,* the Comp-

troller of the Currency denied respondent's application to establish a new bank. The Comptroller conveyed that denial in a short letter which indicated that he had determined that there was no need for the new bank under the relevant statutory standard. While the district court upheld the denial, the circuit court found that the letter did not adequately explain the basis for the Comptroller's no need determination, and remanded for a trial *de novo* evaluating the issue of need on the merits.

The Supreme Court reversed, finding that "[t]he explanation may have been curt, but it surely indicated the determinative reason for the final action taken: the finding that a new bank was an uneconomic venture in light of the banking needs and banking services already available." *Id.* at 143, 93 S.Ct. at 1244. The Supreme Court remanded and instructed the court to determine, on the basis of the agency record at the time of the decision, whether that determination was arbitrary and capricious.

■ Here, as in *Camp,* the Chief provided the basis for the cancellation of the POC sale in his letter to plaintiff:

> I am canceling the POC Aerial Timber sale . . . upon my determination that operations thereunder would jeopardize the continued existence of a Federally-listed threatened . . . species. *Specifically this sale is being canceled because it is located within northern spotted owl habitat. . . .*

Def. Summ. J. Ex. at 340 (emphasis added). Accordingly, the Chief's action must be sustained if it had a rational basis considering the materials available to the Chief at the time he made the determination. *See, e.g., Fort Sumter Tours,* 66 F.3d at 1324 (studies available to Secretary at time of decision to adjust fee under National Parks concession contract considered in challenge to adjustment); *Chicago Mercantile Exch. v. Secs. and Exch. Comm'n,* 883 F.2d 537, 541–42 (7th Cir.1989) (court may consider public documents in evaluating whether agency action is arbitrary or capricious).[18] *De novo* review wherein new evidence on the merits of the

18. While it is determined that this record reveals an adequate basis for the Chief's jeopardy determination, a failure to find such a basis in the

materials available to the Chief at the time of decision could require remand to the Forest Service. *Camp,* 411 U.S. at 143, 93 S.Ct. at 1244.

jeopardy determination is adduced at trial is not appropriate. *See, e.g., Association of Data Processing v. Board of Governors,* 745 F.2d 677, 684 (D.C.Cir.1984) ("whether the administrator was arbitrary must be determined on the basis of what he had before him when he acted, and not on the basis of 'some new record made initially in the reviewing court'") (quoting *Camp,* 411 U.S. at 142, 93 S.Ct. at 1244).

### ii. Basis for Jeopardy Determination

Plaintiff bears the burden of demonstrating that the Chief's jeopardy determination was arbitrary. Accordingly, defendant can meet its initial burden on summary judgment by showing that there is an absence of evidence in the record necessary to prove that the jeopardy determination was arbitrary. *See Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. If defendant makes this showing, the burden shifts to plaintiff to present facts evidencing a reasonable dispute on this issue. *See Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355–56. Here, the record reveals facts evidencing a rational relationship between the Chief's finding that the sale was to occur in spotted owl habitat, and his determination that harvesting the sale was likely to jeopardize the owl. Plaintiff has failed to present facts evidencing a reasonable dispute concerning this jeopardy determination premised upon habitat destruction.

The purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species...." 16 U.S.C. § 1531(b). Because federal activities broadly affect natural habitats, the ESA direction that agencies insure that federal actions do not jeopardize the continued existence of threatened and endangered species is generally regarded as the most effective means of accomplishing this statutory purpose. In accord with this direction and purpose, a federal agency like the Forest Service may not take an action, including selling national forest timber, which "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

As noted earlier, the only specific evaluation of the impact of the sale on the owl was prepared by the Forest Service. In that evaluation, Forest Service biologists found that a portion of the sale was within a SOHA occupied by spotted owls. Under the Forest Service SOHA policy, such areas were to be protected from harvesting. ISC Report at 17. The Forest Service biologists further found that the area of the sale provided a key link in the SOHA network because it facilitated owl dispersal and mating among protected SOHAs. Finally, with respect to harvesting in such an area, the biologists found that:

> [t]he proposed sale essentially targets soon-to-be-dead standing timber. The number and condition of snags and downed logs are important components of suitable spotted owl habitat. Snags [*i.e.,* dead and dying timber] provide food, cover, and nest substrates for a variety of small mammal and bird species used as prey by the spotted owl.

Def. Summ. J. Ex. at 352. Relying upon a habitat study conducted in Six Rivers National Forest, the biologists determined that harvesting the POC sale would further reduce snag densities below levels needed to maintain the suitability of that habitat for owls. Based upon this analysis, and the fact that very little suitable habitat remained in the Gasquet District of Six Rivers, the biologists concluded that the sale was "likely to adversely affect spotted owls and suitable habitat." Def. Summ. J. Ex. at 353.

After the formulation of the biological evaluation of the POC sale, Forest Service biologists led the preparation of the ISC report. In that report, the ISC concluded that the SOHA strategy would not preserve adequate habitat to protect the owl, finding that strategy to be a "prescription for the extinction of spotted owls." ISC Report at 39. The ISC recommended that the SOHA policy be replaced with the establishment of larger HCAs in which no harvesting, including the harvesting of dead and dying timber, should occur. *Id.* at 4, 325. Under the new policy,

a larger portion of the POC sale was located within a preservation area. In particular, the POC sale area was designated a HCA–1, Def. Summ. J. Ex. at 388, meaning that the area was capable of supporting 20 or more owl pairs. ISC Report at 318.

These studies, taken in view of the ESA presumption that species conservation is accomplished through habitat protection, demonstrate a rational relationship between the Chief's finding that the sale was to occur in spotted owl habitat, and his determination that harvesting the sale was likely to jeopardize the continued existence of the owl.

A review of the FWS documents relating to the owl, while appropriate, see Camp, 411 U.S. at 142, 93 S.Ct. at 1244 (review based on "whole record" available to agency), and the rationale underlying that agency's findings, do not undermine the Forest Service biological evaluation, or the ISC's central finding that the SOHA habitat preservation system was too restrictive to protect the owl from extinction.[19]

As noted above, in its biological opinion, the FWS explicitly recognized the importance of dead and dying timber to maintaining the suitability of owl habitat, and concluded that proceeding with the 44 sales would prevent the full implementation of the ISC strategy by harvesting such habitat. At several places in the opinion, the FWS recognized the ISC strategy as the most sound owl conservation strategy then available. Similarly, in the FWS critical habitat designation for the owl, the FWS acknowledged that the designation did not replace the broader HCA network of preservation areas, and recommended that federal agencies follow the ISC recommendation of no harvesting, including harvesting of dead or dying timber, in those larger HCAs.[20]

Directly contrary to plaintiff's challenge to the jeopardy finding, had the Chief relied on the FWS opinion to find no jeopardy in the face of the specific Forest Service adverse affect finding and policy directing that the area be protected from harvest, that reliance would be subject to challenge. See Pyramid Lake, 898 F.2d at 1415. On similar facts, a Forest Service decision to take such a course was found to be arbitrary and capricious.

In Resources Ltd., the Forest Service found that its forest management plan for Flathead National Forest, and particularly the timber harvest level reflected in the plan, would not jeopardize the continued existence of the threatened grizzly bear. 35 F.3d at 1302. The Forest Service made this no jeopardy determination notwithstanding the findings of its own biologists that the harvest levels were not consistent with the agency's bear management strategy, and would adversely impact the bear. Id. at 1304. Defending a challenge to its no jeopardy determination, the Forest Service relied upon a FWS biological opinion finding that neither the plan, nor the harvest levels, would likely jeopardize the existence of the bear. Although the district court deferred to the FWS opinion and rejected the challenge, 789 F.Supp. 1529, 1535 (D.Mont.1991), the Ninth Circuit reversed. 35 F.3d at 1304–05. The Ninth Circuit found that the Forest Service's reliance upon the FWS biological opinion was

---

**19.** It is worth noting that the FWS owl protection efforts at the time of the POC sale were consistently challenged as too limited to prevent the owl's extinction. For example, in finding the FWS decision not to list the owl arbitrary and capricious, the court noted that "[t]he [FWS] disregarded all the expert opinion on population viability, including that of its own expert, that the owl is facing extinction, and instead merely asserted its expertise in support of its conclusions." Northern Spotted Owl, 716 F.Supp. at 483. In its review of the FWS decision not to list, the General Accounting Office noted the significant role political pressure played in that decision, and found that the "FWS management substantively changed the body of scientific evidence presented" in order to support its decision. U.S. General Accounting Office, Endangered Species: Spot-

ted Owl Petition Evaluation Beset by Problems 1 (1989).

**20.** The FWS decision to exclude the area encompassing the POC sale in the critical habitat designation for the owl does not undermine a jeopardy finding based upon habitat modification. As noted earlier, the FWS did not include any timber sale sold and awarded as of August 13, 1991, within the designation based upon economic considerations. While the FWS is permitted to consider economic factors when designating critical habitat, 16 U.S.C. § 1533(b)(2), such balancing of interests is not permitted an agency discharging its duty to insure its actions are not likely to cause jeopardy. 16 U.S.C. § 1536(a)(2).

arbitrary and capricious, both because Forest Service biologists had found that the harvest levels reflected in the plan conflicted with agency policy and would adversely impact the bear, *id.* at 1304, and because the Forest Service had not disclosed those findings to the FWS. *Id.* at 1304.

Plaintiff would have the court ignore such Forest Service conservation strategies and scientific analyses on the ground that they have not been adopted in conformance with the Administrative Procedure Act, 5 U.S.C. § 553, and accordingly do not have the force and effect of law. Since these documents are relied upon here to evaluate whether the Chief's jeopardy determination was arbitrary, not to demonstrate that he was legally obligated to make that determination, plaintiff's argument is inapposite. *See, e.g., Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 913 (Fed.Cir.1988) (relying upon Forest Service Manual to evaluate reasonableness of agency action in bid protest); *Fort Sumter Tours, Inc.,* 66 F.3d at 1334 (relying upon agency guideline and industry studies to evaluate reasonableness of agency's unilateral increase in fee charged under concession contract).

Plaintiff alternatively argues that the ISC report in particular may not be relied upon here, arguing that the Ninth Circuit invalidated it in *Seattle Audubon Soc'y v. Espy,* 998 F.2d 699 (9th Cir.1993). In *Seattle Audubon,* the court found that the Forest Service adoption of the ISC report as the agency owl management strategy was invalid because the agency had not considered new evidence showing that the ISC report recommendations might not be *stringent* enough to maintain viable owl populations. *Seattle Audubon Soc'y v. Moseley,* 798 F.Supp. 1473 (W.D.Wash.1992), *aff'd sub nom., Seattle Audubon Soc'y v. Espy,* 998 F.2d 699, 701 (9th Cir.1993). The fact that new evidence demonstrated that even more stringent protec-

tions than those recommended by the ISC might be necessary to protect the owl supports, rather than undermines, the Forest Service action in this case.

■ Although plaintiff views the link between conserving the owl and protecting its habitat with incredulity, that link is the foundation of the ESA's threatened and endangered species protections. 16 U.S.C. § 1531(b); *Sweet Home,* 515 U.S. at 698, 115 S.Ct. at 2413 (habitat modification included within regulated activities since "the broad purpose of the ESA supports ... [the extension] of protection against activities that cause the precise harms Congress enacted the statute to avoid"); *see* 50 C.F.R. § 17.3 (take prohibition applies to habitat modification or degradation which "kills or injures wildlife by significantly impairing the essential behavioral patterns, including breeding, feeding, or sheltering"). That link has also been the focus of Forest Service owl viability planning since the 1970s, was the basis for the adverse affect finding in the Forest Service biological evaluation of this sale, and was the operating premise of the more stringent strategy embodied in the ISC Report. Accordingly, the Chief's recognition of the importance of habitat preservation to conserving the owl was not arbitrary, and the cancellation of the sale on that ground is therefore sustained.[21]

### iii. Cancellation of other Timber Sales

Plaintiff argues in the alternative that the Chief's reliance upon the cancellation regulation, with its broader measure of compensation, to cancel other timber sales subject to the NEC order demonstrates that his invocation of the species contract provision here was arbitrary. In particular, plaintiff argues that since two of those sales would have purportedly resulted in broader environmental harm, and were canceled pursuant to the

---

**21.** While not explicitly raised by the plaintiff, this analysis is not affected by the fact that the Forest Service biological evaluation and the owl's listing under the ESA predated the award of the POC contract. Contract provision C8.2(2)(d) does not specify that cancellation for species considerations must be based upon conditions discovered post-award. *Peters,* 694 F.2d at 689–90 (challenged modification anticipated and grounds

known to parties at time of contracting); *Thomas Creek Lumber,* 32 Fed.Cl. at 790 (interpreting similar provision to find that grounds for suspension known pre-award may be properly invoked to suspend contract performance); *Appeal of Superior Timber Co.,* IBCA No. 3459, 1996 WL 719922 (Dec. 12, 1996) (BLM may avoid liability for contingencies known pre-award by so providing in the contract).

"serious environmental degradation and re-source damage" subsection of 36 C.F.R. § 223.116, the Chief's decision to cancel the POC sale pursuant to the species contract provision was arbitrary.

█ A contract construction which gives effect to all terms will prevail over an interpretation which leaves terms meaningless or superfluous. *See Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir. 1985). As noted earlier, contract provision C8.2(2)(a) tracks the language of 36 C.F.R. § 223.116(a)(5), allowing the Chief to cancel for "serious environmental degradation or resource damage," and providing for the same measure of compensation reflected in the regulation. The species contract provision at issue here follows at C8.2(2)(d). Accordingly, a contract construction which recognizes that the two contract clauses, one permitting cancellation for "serious environmental degradation and resource damage," and the other for "jeopardy to threatened and endangered species, or adverse impact to a sensitive species," embrace factually different circumstances, will be preferred here.

Plaintiff itself argues that the other sales to which it points and the POC sale reflect those different circumstances. Plaintiff affirmatively alleges that the other canceled sales were distinguishable from the POC sale because those sales were larger, and, according to plaintiff, would have resulted in broader environmental harm. At the same time, plaintiff emphasizes that the POC sale was designed to test a low-impact harvesting method designed to avoid broad environmental harm. Accordingly, under the force of plaintiff's own logic, the Chief's use of different cancellation authorities was not arbitrary since there was a rational basis upon which to distinguish the sales.

In any case, plaintiff's argument is one of form rather than substance. While the Chief terminated the other five sales subject to the NEC order for "serious environmental degradation and resource damage," four of the purchasers contemporaneously agreed that compensation for that cancellation would not include lost profits, replacement cost of timber or any other anticipatory profits. Only one purchaser received the higher measure plaintiff seeks. Plaintiff's argument consequently falls of its own weight since it is actually seeking to be treated differently from all but one of the other purchasers subject to the NEC order.

### III. Alternative Grounds for Cancellation

█ Although it is determined that species cancellation provision C8.2(2)(d) is valid, and that the Chief's exercise of that provision based upon his determination that contract performance would likely jeopardize the owl was not arbitrary and capricious, there existed other undisputed grounds to cancel the sale. It is settled law that where the government has canceled a contract based upon erroneous grounds, the cancellation may be sustained if there existed an adequate ground for cancellation at the time of cancellation, even if the ground was not then known. *College Point Boat Corp. v. United States,* 267 U.S. 12, 16, 45 S.Ct. 199, 201, 69 L.Ed. 490 (1925); *see also United States v. Amdahl Corp.,* 786 F.2d 387, 394 n. 7 (Fed. Cir.1986); *Joseph Morton Co. v. United States,* 757 F.2d 1273, 1279 (Fed.Cir.1985); *Pots Unlimited, Ltd. v. United States,* 220 Ct.Cl. 405, 600 F.2d 790, 793 (1979); *John Reiner & Co. v. United States,* 163 Ct.Cl. 381, 325 F.2d 438, 443 (1963). This basic proposition is also reflected in the harmless error rule of administrative law which permits a court to uphold an agency determination upon a ground different from that relied upon by the agency where " 'it is clear that . . . the agency would have reached the same ultimate result. . . .' " [22] *Ward v. Merit Sys-*

---

**22.** In *Securities and Exchange Comm'n v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943) (*Chenery I*), the Supreme Court found that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Id.* at 87, 63 S.Ct. at 459. Courts applied this holding to reject administrative decisions based upon an erroneous ground even where an adequate ground for the decision was evident in the record. In such cases, rather than affirming on the adequate ground, courts would remand to the agency for further proceedings. The harmless error rule, *see* 5 U.S.C. § 706 ("due account shall be taken for the rule of prejudicial error"), developed as an exception to this application of

*tems Protection Bd.*, 981 F.2d 521, 528 (Fed. Cir.1992) (quoting *Salt River Project Agric. Improvement & Power Dist. v. United States*, 762 F.2d 1053, 1060 n. 8 (D.C.Cir. 1985)).

### a. Forest Service NFMA Authority and Cancellation for Adverse Impact under C8.2(2)(d)

As noted earlier, the Forest Service has not only the authority, but a legal duty independent from the ESA to protect the owl. *See Seattle Audubon*, 952 F.2d 297. Pursuant to NFMA, the Forest Service must maintain viable populations of the owl, a sensitive species under NFMA implementing regulations and policy. 16 U.S.C. § 1604(g)(3); 36 C.F.R. § 219(19); FSM § 2670; FSM § 2633.4 (1978). Species contract provision C8.2(2)(d) reflected this independent duty by providing that the Chief could cancel if the sale would "cause unacceptable adverse impacts on sensitive species." Even if the record were considered inadequate to support the Chief's jeopardy determination, under the rationale of *College Point* and its progeny, the adverse affect finding in the Forest Service biological evaluation presents an independent adequate ground for cancellation in this case.

 Plaintiff argues against this conclusion, maintaining that NFMA's wildlife diversity and viability requirements apply, if at all, only to the forest management planning process, not to individual timber sales. This argument is directly contradicted by the terms of the contract and case law. First, as noted above, contract provision C8.2(2)(d) specifically empowered the Chief to cancel the contract for adverse impacts to a sensitive species, and the Forest Service has the discretion to adopt such a term under NFMA. *See supra* discussion at I.a. Further, the terms of NFMA itself do not limit the consideration of wildlife diversity to the management planning process. *See* 16 U.S.C. § 1604(g)(3)(B). Second, the case relied upon by plaintiff in support of this argu-

ment, *Environment Now! v. Espy*, 877 F.Supp. 1397, 1420 (E.D.Cal.1994), and its reading of NFMA's diversity and viability requirements, has been rejected by the Ninth Circuit. *Inland Empire Public Lands Council v. United States*, 88 F.3d 754, 760 n. 6 (9th Cir.1996).

Plaintiff alternatively argues that NFMA's diversity and viability requirements are too vague to be enforced. The case law plaintiff cites for this proposition reflects that the Forest Service's translation of NFMA's clear diversity policy into concrete planning requirements has generated debate, but does not support plaintiff's conclusion that those requirements are therefore unenforceable. To the contrary, the case law cited by plaintiff holds that since such questions involve substantial technical expertise, the Forest Service implementation of those requirements is entitled to deference. *Sierra Club v. Robertson*, 810 F.Supp. 1021, 1028 (W.D.Ark.1992), *aff'd*, 28 F.3d 753 (8th Cir. 1994); *Glisson v. United States Forest Service*, 876 F.Supp. 1016, 1029 (S.D.Ill.1993), *aff'd*, 51 F.3d 275 (7th Cir.1995).

In fact, the Forest Service began implementing this NFMA duty in the case of the spotted owl beginning in the late 1970s. The successful challenges to the agency's implementation of that duty halted timber sales throughout the Pacific Northwest on the ground that the Forest Service had not adequately provided for owl viability. These challenges prompted the agency's study and development of progressively more protective habitat preservation strategies. It was this NFMA duty that prompted the Regional Forester for Six Rivers National Forest to instruct his Forest Supervisors that together NFMA and the owl's status as a sensitive species "require[d] habitat protection and protection of individual organisms from harm or harassment," Region 5 Directive (internal citations omitted), and to direct Supervisors to "plan for management of National Forest lands to provide for the continued viability of this species." *Id.*

---

*Chenery I,* and allows a court to affirm on the adequate ground and avoid remand where it is clear that the agency would have reached the same ultimate result. *See, e.g., Sahara Coal Co.*

*v. Office Workers' Compensation Programs, United States Dep't of Labor,* 946 F.2d 554, 558 (7th Cir.1991).

Plaintiff argues in the alternative that even if the Chief has the authority to consider wildlife viability in the context of an individual timber sale, there is a factual dispute concerning whether the adverse affect finding in the biological evaluation was arbitrary. In particular, plaintiff claims that the FWS informal conference report responding to the Forest Service finding raises a genuine question of fact on this issue.

As noted earlier, although the FWS disagreed with the Forest Service adverse affect finding, this FWS disagreement was based upon the rationale that the suitable habitat to be harvested by the POC sale would be rendered unsuitable notwithstanding the sale because the subject trees were dying. Plf. Summ. J. Ex. at 59. Since the Forest Service evaluation was premised on the fact that dead timber was necessary to maintain the suitability of habitat, the FWS rationale was not responsive to the Forest Service concern. That FWS rationale also conflicted with its own definition of suitable spotted owl habitat which recognized the importance of such trees. *See supra* at II.b. Further, in the same report, the FWS recommended that Forest Service funds be expended to add snags and downed trees after harvest to replace the lost habitat. *Id.* The FWS concluded that with this replacement of this habitat, the portion of the POC sale in the SOHA would not adversely affect the owl. *Id.*

This FWS conclusion recognizing the importance of such habitat, and recommending its replacement in order to avoid adverse impacts, is consistent with the Forest Service adverse affect finding. A Forest Service preference to retain present habitat, instead taking the suggested course of harvesting that habitat and expending federal funds to replace it, could not be characterized as arbitrary.

*b. Forest Service Authority to Cancel Pursuant to NEC Order and Contract Provision C8.2(1)*

Although the Forest Service exercise of species contract provision C8.2(2)(d) was valid, cancellation of the POC contract pursuant to C8.2(1) may have also been appropriate.

Provision C8.2(1) provided the Forest Service with the authority to cancel the POC sale "to comply with a court order," and provided that purchasers would not be entitled to compensation of anticipatory profits or out-of-pocket expenses on contracts canceled pursuant to this subsection. This contract provision is valid under the same analysis applied above to hold species contract provision C8.2(2)(d) valid.

The settlement order entered in the NEC suit provided that "[t]he Forest Service will terminate the contracts for the following six sales, Mini, Resalvage, POC Aerial, Tomcat, Cotton, and Wilson. These sales will not be offered or re-offered." Plaintiff affirmatively alleges that the POC contract was canceled by the Forest Service in order to comply with the order. Plf. Rep. Br. at 18.

**CONCLUSION**

Since the early 1970s when the Forest Service first recognized that the harvesting of national forest timber was responsible for the owl's decline, the agency's owl conservation strategy has focused upon the relationship between that habitat and the owl. Those strategies directed that the area encompassing the POC sale be protected from harvesting, and formed the basis for the Forest Service finding that harvesting the sale would adversely affect the owl. In view of this information, the Chief's determination that harvesting the POC sale would likely jeopardize the continued existence of the owl was not arbitrary, and his cancellation of the sale pursuant to the species contract provision is therefore sustained.

Accordingly, on cancellation of the POC contract, **IT IS ORDERED:**

(1) Plaintiff's motion for summary judgment is **DENIED**. Defendant's motion for summary judgment is **GRANTED**;

(2) Plaintiff is entitled to compensation as provided by POC contract provisions C8.2(2)(d) and C9.52;

(3) Absent the filing of a stipulation by the parties, on or before 45 days from the date of this Opinion, providing the amount to be entered as the final judgment in this matter,

an order will be issued scheduling required pretrial submissions.