**THOMAS CREEK LUMBER & LOG COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Nos. 91–1683C, 92–42C.**

United States Court of Federal Claims.

Feb. 17, 1995.

Joseph A. Yazbeck, Jr., Portland, OR, for plaintiff.

Brad Fagg, with whom were Asst. Atty. Gen. Frank W. Hunger, David M. Cohen, Director, and Jeanne E. Davidson, Asst. Director, Washington, DC, for defendant.

## OPINION

ANDEWELT, Judge.

### I.

This government contract action is before the court for decision after trial. Plaintiff, Thomas Creek Lumber and Log Company, seeks damages resulting from a temporary suspension of plaintiff's harvesting operations under two timber contracts, the Good Old Boy (GOB) and Upper Slash contracts, plaintiff entered with the United States Department of the Interior, Bureau of Land Management (BLM). The BLM based its harvesting suspension on surveys indicating the presence of northern spotted owls on both contract sites. Plaintiff contends that the BLM's suspension of harvesting on the GOB site violated the requirements of Section 41x of the GOB contract,[1] and that the BLM improperly delayed lifting the suspensions on both the GOB and Upper Slash sites. Plaintiff seeks as damages its increased operating costs and loss of profits resulting from the suspension on the GOB site and the delay in lifting the suspensions on both the GOB and Upper Slash sites.

### II.

On December 29, 1989, the BLM issued a prospectus seeking bids for the harvesting of timber on the GOB contract area. Approximately five months earlier, on July 26, 1989, James England, a BLM biologist, reported audio contact with a northern spotted owl in that same area. Apparently to reflect England's report, the BLM issued a "Correction Notice" to the GOB prospectus informing prospective bidders that "[a] sensitive wildlife species is in the vicinity of the sale area" and adding further harvesting restrictions to those set forth in the original prospectus. The parties entered the GOB contract effective March 13, 1990. Section 41x of the GOB contract provides:

### ENVIRONMENTAL PROTECTION

\*   \*   \*   \*   \*   \*

x.   The purchaser shall immediately discontinue specified construction or timber harvesting operations upon written notice from the Authorized Officer that sensitive, threatened, or endangered plants or animals protected under the Endangered Species Act of 1973 have been discovered to be present on the area. Discontinued operations may be resumed upon receipt of written instructions and authorization by the Authorized Officer.

When the parties entered the GOB contract, the northern spotted owl was not listed as an endangered species under the Endangered Species Act of 1973. Thereafter, the United States Fish and Wildlife Service (FWS) announced its listing of the northern spotted owl as endangered, effective July 23, 1990. In response to the FWS's proclamation, Wayne Barney, a BLM "Authorized Officer," sent a letter to plaintiff invoking Section 41x of the GOB contract, and the identically worded Section 41z of the Upper Slash contract, and suspending harvesting on both contract sites as of July 23, 1990. Barney explained that there were "spotted owls on the contract area[s] which may be affected by continued operations of the contract[s]," and that the BLM would consult with the FWS as to future timber harvesting on those sites, consultations in which plaintiff was invited to join. After the conclusion of the consultation process, on November 23, 1990, the FWS informed the BLM that the BLM could lift the suspensions on the GOB and Upper Slash contract sites. The BLM lifted the suspensions on January 29, 1991, and March 28, 1991, respectively.

### III.

█   The first issue the court must address is the standard this court should employ when evaluating the BLM's actions under Section 41x. The responsibilities of the contractor under Section 41x are stated with specificity. The contractor must cease timber harvesting upon receipt of a letter from the BLM indicating the discovery of the presence of an endangered animal in the area, and may not resume harvesting until the contractor receives written authorization from the BLM. Section 41x, however, does not similarly define with specificity the responsibilities of the BLM when issuing a suspension letter indicating the discovery of an endangered species or any subsequent letter authorizing resumption of harvesting.

---

1.   Plaintiff concedes the appropriateness of the BLM's suspension on the Upper Slash site.

Section 41x thereby would appear to leave the issuance of such letters to the discretion of the BLM. The absence, however, of any specific limitation on the BLM's discretion does not mean that the BLM's actions are free from judicial scrutiny. "It is a well-established principle of law that a 'party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously.'" *American Export Isbrandtsen Lines, Inc. v. United States,* 204 Ct.Cl. 424, 465, 499 F.2d 552, 576 (1974) (quoting *Pacific Far East Line, Inc. v. United States,* 184 Ct.Cl. 169, 184, 394 F.2d 990, 998 (1968)). Hence, the court must determine whether the authorized BLM officer acted reasonably in his disputed decisions to suspend harvesting on the GOB contract site and to delay authorizing the resumption of harvesting on the GOB and Upper Slash contract sites.[2]

Plaintiff argues that the BLM's suspension of the GOB contract violated Section 41x for a series of reasons.

### A.

■ First, plaintiff argues that Section 41x authorizes the BLM to suspend harvesting only when an endangered species is discovered on the area *subsequent* to the signing of the contract, and there was no such discovery because England's 1989 contact with a spotted owl occurred eight months prior to the signing of the contract. But interpreting Section 41x to allow for a suspension only where endangered animals are discovered after the signing of the contract is inconsistent both with the literal wording of Section 41x and with the intent that obviously underlies that provision.

Section 41x requires suspension of harvesting in response to a BLM notice to the contractor that endangered animals "have been discovered." Section 41x contains no limitation as to when that discovery must occur. Therefore, it is sufficient under the literal terms of Section 41x that the discov-

ery occurred at some time in the past. Plaintiff contends that such a literal interpretation could unreasonably harm contractors, for example by allowing for a suspension based on a single, 20-year-old discovery that was never subsequently verified. But plaintiff's contention is not realistic because, as explained above, any suspension issued by the BLM must be reasonable.

More fundamentally, however, to the extent plaintiff argues that the BLM could not have properly suspended harvesting on the GOB contract site under Section 41x because the prerequisites for such a suspension had occurred and were known to the parties prior to entering the contract, plaintiff is simply wrong. Under Section 41x, there are two pertinent requirements for a suspension letter: (1) the discovery of an animal in the area, and (2) the listing of that animal as "[an] endangered ... animal[ ] protected under the Endangered Species Act." Herein, the two prerequisites for such a suspension were not known to the parties when they entered the contract on March 13, 1990, because the FWS did not list the spotted owl as endangered until July 23, 1990. Until that date, the discovery of an "endangered" animal had not yet occurred.

In this regard, plaintiff's proposed interpretation of Section 41x as requiring a new discovery of a spotted owl in the contract area subsequent to the contract date would seriously undermine the goal articulated in the heading of Section 41x, "ENVIRONMENTAL PROTECTION." A suspension under Section 41x is not necessarily a permanent decision as to the harvesting of timber under the contract. Rather, as indicated in Barney's suspension letter to plaintiff, after the initial suspension, the BLM begins consultations with the FWS to assess the extent to which continued harvesting under the contract may affect the endangered animal. The purpose of the suspension is therefore prophylactic—suspension maintains the status quo until an appropriate analysis can be made regarding the effect that continued timber harvesting in the area may have on the endangered animal. Plaintiff's proposed

**2.** Defendant cites *Peter Kiewit Sons' Co. v. United States,* 151 F.Supp. 726, 138 Ct.Cl. 668, 674 (1957), for the proposition that the BLM cannot be liable for a breach of contract herein unless its actions were negligent. But *Peter Kiewit* is inapposite because it involved a claim that the government failed to deliver work material to the

contractor according to the terms of the contract. It did not involve a claim, as that involved here, that the government erred in making a determination within its discretion under the contract. Where discretion is involved, the standard articulated in *American Export* applies.

interpretation of Section 41x would negate this prophylactic purpose. It would permit timber harvesting to continue until a new survey could be completed without any consideration of the effect that such continued harvesting would have on the endangered animal previously identified on the contract area. Continued harvesting under such circumstances could potentially destroy an endangered animal and/or its critical habitat. This would seem precisely the type of environmental harm that Section 41x was intended to protect against.

**B.**

■ Next, plaintiff attacks the BLM's suspension of the GOB contract on the grounds that England's 1989 survey was not performed in accordance with professional scientific standards and therefore could not reasonably be cited to support the presence of a spotted owl in the area. Plaintiff argues that England's survey was fatally flawed, *inter alia*, because England skipped certain observation points during the survey and failed to perform a daytime follow-up visit to confirm the owl's presence.

The adequacy of England's survey was the subject of considerable testimony at trial. An owl survey consists of visiting a series of numbered station locations at a particular site and playing a tape of recorded owl calls. If an owl responds to the recorded owl calls, the biologist assesses and records an approximate location vector and distance for the owl. The biologist then travels to the next station and repeats the procedure. England recorded a response from the owl at the first station, but he wrote the word "skip" on his survey record for the second station. Plaintiff interprets this notation to mean that England improperly skipped the second station and went directly from the first station to the third. Testimony, however, established that England did not "skip" any of the stations, but simply "skipped" playing the recorded owl call at the second station because the owl was still responding to the first

recorded call. England's action in this regard is consistent with professional practice because playing a recorded call while an owl is still responding to a prior call could draw the owl closer to the surveyor. Similarly, the absence of a follow-up daytime visit does not negate the adequacy of England's night-time audio contact.

Although England's survey techniques may not have been accurate enough to pinpoint the owl's location with precision, such precision is not a prerequisite to establish an animal contact that is recognized as valid by the scientific community. England's considerable experience with spotted owl identification and his familiarity with the contract area lead the court to conclude that England performed a competent scientific survey and was correct in concluding that he had discovered a spotted owl within the boundaries of the GOB contract area in July 1989. Hence, the BLM necessarily acted reasonably in relying upon England's survey.[3]

**C.**

■ Plaintiff's next argument focuses on an internal June 4, 1990, BLM memorandum prepared by the state director of the BLM Oregon State Office in anticipation of the spotted owl being listed under the Endangered Species Act. As described above, to support a suspension, Section 41x requires only the discovery that an endangered animal is "present" on the area. The trial testimony indicates that a finding that an animal is "present" can properly be based on a single contact with the animal in an area. Plaintiff interprets the June 4, 1990, memorandum, however, to authorize a suspension under Section 41x only if the BLM determines that the endangered animal has established "occupancy" in the area. Something more than the single contact involved here is required to establish "occupancy." Plaintiff argues that the BLM breached the GOB contract because it violated the BLM's memorandum requiring a determination of "occupancy" before a contract can be suspended.

---

**3.** Plaintiff notes that two surveys were conducted subsequent to England's 1989 survey but prior to the suspension of harvesting on the GOB site and these surveys did not detect the presence of the spotted owl. But these subsequent surveys do not negate the fact that in one survey an owl had been discovered on the GOB contract area. It

was reasonable for the BLM to suspend harvesting pursuant to Section 41x so as to allow consultation during which the parties could assess the significance of these subsequent surveys and the possible effect that continued harvesting may have on the spotted owl.

But plaintiff cannot base a breach of contract claim on the terms of the internal BLM memorandum. The June 4, 1990, memorandum, written nearly three months after the start of the contract, is not a part of the express contract terms and has not been incorporated into the GOB contract or into any formal BLM regulations. "In suing for a breach of contract plaintiff must rely on the express terms of the contract and cannot, as it has attempted to do here, import into the agreement terms outside of those expressly contained in the agreement." *State of Texas v. United States,* 210 Ct.Cl. 522, 531, 537 F.2d 466, 471 (1976).

In any event, plaintiff fails to demonstrate that the BLM acted in a manner inconsistent with its then-existing internal policy when it suspended the GOB contract. The text of the June 4, 1990, memorandum arguably is ambiguous as to whether a showing of "occupancy" rather than "presence" is required for a Section 41x suspension.[4] Moreover, even if the memorandum did purport to require "occupancy" before a contract can be suspended, that position did not remain the BLM's position. Subsequent to distribution of the June 4, 1990, memorandum, BLM biologists had discussions with state officials in an effort to clarify the BLM's policy. At the end of those discussions, the BLM took the position that a single contact with a spotted owl was sufficient to support a suspension of timber harvesting. Hence, the BLM's suspension of the GOB contract based on a single contact with a spotted owl not only was consistent with the contract terms, but also was in accord with existing BLM policy.

### D.

■ Next, plaintiff focuses on the phrase "on the area" in Section 41x. Section 41x requires an endangered animal to "have been discovered to be present *on the area*" (emphasis added). The GOB contract contains a map which delineates both a "contract area" and a smaller "cutting area" within the contract area in which the contractor can harvest timber. Plaintiff argues that the phrase "on the area" in Section 41x does not refer to the larger contract area but rather to the smaller cutting area, which plaintiff alleges is also known in the trade as the "sale area." Under this definition, plaintiff argues, suspension of harvesting would not be reasonable under Section 41x because England's 1989 survey recorded a spotted owl near the border of the larger contract area and not inside the smaller cutting area.

But Section 41x does not use the term "cutting area" but merely refers to "the area." To determine to which area Section 41x refers, it is necessary to place Section 41x in the context of the remainder of the contract. There are two sections listed under the heading "ENVIRONMENTAL PROTECTION," Sections 41w and 41x. It would seem appropriate to read these clauses together when defining the scope of the measures available to the authorized officer to protect the environment on the GOB contract site. The only use of the word "area" in Section 41w is the reference to "contract area." Section 41w provides:

w. If in connection with operations under this contract the Purchaser, his contractors, subcontractors, or the employees of any of them, discover, encounter, or become aware of any objects or sites of cultural value on the contract area such as historical or prehistorical ruins, graves or grave markers, fossils, or artifacts, the Purchaser shall immediately suspend all operations in the vicinity of the cultural value and notify the Authorized Officer of

---

4. Plaintiff relies exclusively on Section C of the memorandum to make its argument in favor of an "occupancy" requirement. It is Section B of that memorandum, however, that presents the criteria for identifying activities which "may affect" the northern spotted owl. According to Section B, "[a] key element in initiating the formal consultation process [between the FWS and the BLM] is the 'may affect' determination." Section B describes "may affect" activities as "[a]ny activity (primarily timber sales) which reduces spotted owl habitat" as long as the activity is one over which the BLM retains discretionary authority. As an example of an activity over which the BLM has discretionary authority, Section B names "awarded sales when an owl is *located* within the contract area boundary" (emphasis added). Thus, Section B uses the term "located," not "occupancy," to describe the status of spotted owls that may merit suspension of the contract. The term "located" in Section B is consistent with Section 41x which on its face requires the mere "presence" of an owl on the contract site in order to justify suspension. Section C, on the other hand, arguably points in a different direction in that it suggests that "occupancy" of an owl is required before sending a contract to consultation.

the findings. Operations may resume at the discovery site upon receipt of written instructions and authorization by the Authorized Officer.

Reading the two provisions together, it seems apparent that the antecedent basis for "the area" in Section 41x is the reference to "contract area" in Section 41w, i.e., the reason Section 41x did not further define "the area" is that it was referring to the same area named in the prior section. It would seem that if the parties intended Section 41x to refer to a different area than that mentioned in Section 41w, i.e., the cutting area, the parties reasonably would have been expected to so specify in Section 41x.

Plaintiff points to the "Correction Notice" to the original GOB prospectus which notified potential contractors of the discovery of a sensitive animal "in the vicinity of the sale area." Plaintiff suggests that this reference to "sale area" directed the contractor, with respect to environmental concerns dealing with animals, to the cutting area. But the term "sale area" appears only in the introductory paragraph of the "Correction Notice" and was never incorporated into the final contract. Moreover, the "Correction Notice" does not suggest that the sale area, rather than the contract area, is the appropriate boundary for concern as to an animal's presence. Indeed, the notice expresses concern because a sensitive animal was found "in the vicinity of the sale area." The phrase "in the vicinity" implies that the animal may have been found close to, but not in, the sale area.

Accordingly, the phrase "on the area" in Section 41x should be interpreted as a reference to the "contract area" which is designated as the bounds of environmental protection under Section 41w. Therefore, the authorized officer's determination that England's 1989 survey identified a spotted owl "on the area" in this instance was entirely reasonable. Because this court rejects each of plaintiff's arguments as to the BLM's breach of the GOB contract, plaintiff's breach of

contract claim for unwarranted suspension of harvesting on the GOB contract site is denied.

## IV.

■ As a separate claim, plaintiff contends that the BLM breached Section 41x of the GOB contract and Section 41z of the Upper Slash contract by unnecessarily delaying the lifting of the suspensions on both the GOB and Upper Slash sites. On November 27, 1990, the state director of the BLM Oregon State Office announced that consultations on the GOB and Upper Slash contracts had been completed and that the suspensions on both contracts, which had been in effect for four months, could be lifted. The BLM did not lift the GOB suspension until January 29, 1991, and the Upper Slash suspension until March 28, 1991. Plaintiff contends that the BLM's failure to authorize resumed operations on the GOB and Upper Slash sites immediately upon notice that the suspensions could be lifted constitutes a breach of contract.[5]

No clause in either contract requires that a suspension be lifted immediately upon notice that a suspension is not required. Both the GOB and Upper Slash contracts simply state that "operations may be resumed upon receipt of written instructions and authorization by the Authorized Officer." This provision therefore grants discretion to the authorized officer, and as discussed previously, the authorized officer must exercise that discretion reasonably.

At trial, the court heard conflicting testimony as to the BLM's delayed lifting of the suspensions. For the reasons explained by the court at the end of trial, the court concludes that the reason for the BLM's delay was that plaintiff informed the BLM that there was no rush in lifting the suspensions because plaintiff did not intend to harvest timber until the spring. In the context of

5. In its post-trial brief, plaintiff argues that clauses in both the GOB and Upper Slash contracts which forbid harvesting operations during specific calendar periods should be interpreted as the only allowable shut-down periods under the contracts. This court rejected this argument with respect to the Upper Slash contract in a prior order. See Thomas Creek Lumber & Log Co. v.

United States, Nos. 91–1683C and 92–42C, slip op. at 2–3 (Ct.Fed.Cl. Jan. 8, 1993) (order denying plaintiff's motion for reconsideration). The court will not reconsider this issue, but rather reaffirms its decision rejecting this argument with respect to the Upper Slash contract, and adopts the same reasoning in rejecting the identical argument with respect to the GOB contract.

such a statement, it was reasonable for the authorized officer to delay lifting the suspensions to the extent that he did.

### Conclusion

For the reasons set forth above, the court concludes that the BLM acted reasonably in suspending harvesting on the GOB contract site and in delaying lifting the suspensions on both the GOB and Upper Slash contract sites. Accordingly, the Clerk of the Court shall enter judgment dismissing plaintiff's complaint. No costs.

**IT IS SO ORDERED.**