**Richard W. HAYES and, Cynthia D. Hayes, d/b/a American Wholesale Block, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 98–687C.

United States Court of Federal Claims.

May 17, 1999.

---

Lynn Kirsch, Las Vegas, Nevada, for plaintiff.

Matthew P. Reed, Washington, D.C., appeared for defendant with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, and Assistant Director Mark A. Melnick, United States Department of Justice, Washington, D.C.

## OPINION

BRUGGINK, Judge.

This dispute arises out of two mineral sales contracts between plaintiffs and the Bureau of Land Management ("BLM"). In their complaint, plaintiffs allege that BLM wrongfully suspended these contracts based on an improper determination that they did not possess a valid state permit to conduct their mining operation. They now seek damages resulting from the suspension. The matter is currently pending on the parties' cross-motions for summary judgment. Defendant argues in its motion that: (1) the actions of the agency in suspending plaintiffs' contracts were reasonable based upon the information available at the time of the suspension; and (2) a prior state agency determination that plaintiffs did not have a valid state mining operation permit collaterally estops them from re-litigating this issue. In their cross-motion, plaintiffs contend that a decision by the Interior Board of Land Appeals ("IBLA"), holding that the suspension was improper because the record did not show that plaintiffs were operating without a valid state permit, collaterally estops defendant from re-litigating the issue of whether the permit was valid. The matter is fully briefed and oral argument was held on April 20,

1999. For the following reasons, defendant's motion for summary judgment is granted and plaintiffs' motion for summary judgment is denied.

## BACKGROUND [1]

Richard and Cynthia Hayes are the sole owners of American Wholesale Block ("AWB") and, along with AWB, bring this action. On October 12 and again on December 2, 1994, AWB entered into contracts with BLM for the sale of mineral materials. Pursuant to the contracts, BLM was to sell to AWB specific quantities of mineral materials for removal from the Pahrump Community Pit ("pit"), located in Pahrump, Nevada. The pit is on federal land and is managed by BLM. Both contracts were for a one-year period.

Contemporaneously with the execution of these contracts, AWB signed a document entitled "Acceptance of Stipulations for Sand and Gravel Operations in Community Pits" ("Stipulation Agreement"). The parties stipulated in that document that AWB was required to "conform to all Federal, State of Nevada, County, and Local laws, ordinances and regulations," and "submit copies of all permits, variances, easements, etc. to the Authorized Officer within thirty (30) days of their issuance." It was also stipulated that BLM had the option of suspending or terminating the contracts, through written notice, if AWB violated any provisions of the Stipulation Agreement:

> If the Purchaser violates any provisions of this contract, the Authorized Officer through written notice, has the option of refusing: to issue any additional materials contracts to the Purchaser or suspending any further operations of Purchaser under this contract, except for such operations that may be necessary to remedy any violations. If purchaser fails to remedy all violations within thirty (30) days after receipt of this suspension notice, the Authorized Officer may, by written notice, cancel this contract and take appropriate action to recover all damages suffered by the

---

1. The facts are drawn from the pleadings, the undisputed proposed findings of facts and attachments submitted by the parties.

Government by reason of such violations, including application towards payment of such damages of any advance payments and any performance bonds.

To provide access to the pit, BLM designated an access road to be used exclusively by AWB and its customers. Following the execution of the first contract, AWB arranged to sell materials obtained from the pit to private parties.

On September 28, 1994, AWB filed an application for an Air Quality Operating Permit ("permit") with the Division of Environmental Protection of the Nevada Department of Conservation and Natural Resources ("NDEP"). This was required by Nevada Administrative Code ("NAC") § 445 *et seq.* prior to performing mineral extraction. The permit includes the following condition: "This permit ... [i]s issued on the condition of acceptance of all restrictions and conditions contained on this permit as evidenced by signing hereof by a responsible official." On November 18, 1994, NDEP sent two copies of the permit to AWB for acknowledgment of acceptance of the permit. On December 1, 1994, Richard Hayes signed one of the copies of the permit on behalf of AWB and returned it to NDEP. When it was received by BLM, a line had been drawn through the words "[i]s issued on condition of acceptance." [2]

Prior to Hayes signing the permit, an NDEP employee conducted an air quality inspection of AWB's facilities on October 5, 1994. During that inspection, he concluded that AWB was operating an aggregate screening plant without a valid permit. The inspector also noted that the plant was producing excessive fugitive dust emissions. [3]

Based on this inspection, the Nevada Bureau of Air Quality ("NBAQ"), a component of NDEP, issued a Notice of Alleged Violation ("NOAV") to AWB, dated November 16, 1994, alleging that the screening plant was producing "excess particulate omissions" in violation of NAC § 445.734. A second NOAV,

also dated November 16, was issued alleging that AWB was operating the screening plant without a valid air quality permit. Both of these notices directed AWB to take corrective action. The notices were re-issued in the same form on January 16, 1995. The NOAVs were sent to Mr. Hayes twice by certified mail but were returned unclaimed. The Nye County Sheriffs Office tried to serve the NOAVs on Mr. Hayes personally, also without success. From the fact that AWB filed a request for a hearing regarding the NOAVs with the Nevada State Environmental Commission ("State Commission"), it is apparent that AWB eventually received these notices, although it is not clear when.

In a letter dated March 14, 1995, NBAQ advised the Contracting Officer ("CO"), Susan Hepworth, that it had issued NOAVs to Richard Hayes for operating an aggregate plant without a permit and creating fugitive dust emissions. NBAQ informed the CO of its failed attempts to serve these notices to Hayes. NBAQ concluded the letter by the requesting BLM to suspend AWB's contract as a last "alternative to get American Wholesale Block into compliance."

In her declaration before this court, the CO writes that her office also received a phone call from NDEP on March 20, 1995. She states that "[d]uring that call we were advised that AWB did not possess a valid [permit] and were asked to suspend AWB's contracts with the BLM."

NBAQ wrote the CO on March 27, 1995, enclosing copies of the October 5, 1994 inspection report and the NOAVs. This letter again informed the CO of the NOAVs and NBAQ's difficulties in serving the notices on Hayes. NBAQ also requested a suspension of the contracts: "We feel suspension of the contracts is our last alternative to get [AWB] into compliance. To get into compliance, Mr. Hayes must pay a fine of $125.00 for fugitive dust and obtain an [permit]. Your office will be notified once Mr. Hayes is in compliance." The CO states in her declaration that, following receipt of this letter, she submitted a

2. Richard Hayes denies crossing out this language and denies having any knowledge as to how the line appeared.

3. As a certified smoke reader, the inspector was able to visually determine that the dust emissions from AWB's operations exceeded the allowable opacity limit.

request to the BLM Area Manager, Marvin D. Morgan, to suspend AWB's operations.

On April 10, 1995, the Area Manager issued an order directing AWB to suspend its operations at the pit:

It has come to the attention of this office that Mr. Richard Hayes of [AWB] has been operating an aggregate screening plant without an Air Quality Operating Permit. On October 5, 1994, [an NDEP] staff member verified that AWB has constructed an aggregate screening plant without applying for and receiving an air quality operating permit. During this inspection excess fugitive dust emissions were noted. The [NBAQ] has issued AWB [an NOAV]. This NOAV has been sent to Mr. Hayes twice by certified mail but was returned unclaimed. The Nye County Sheriff's Office has also tried to serve the NOAV to Mr. Hayes with no success.

The referenced NOAV is enclosed. The [NBAQ] has requested that this office suspend AWB's operations under the current contracts. Therefore, due to noncompliance with [the Stipulation Agreement], AWB's operations in the [pit] are hereby suspended until such time as this office is notified by [NBAQ] that AWB is in compliance.

Contemporaneously with the order, BLM closed AWB's access road to the pit and cordoned off the site with yellow tape on which was written, "Police Line, Do Not Cross." [4]

On April 18, 1995, Richard Hayes faxed to BLM what was apparently a copy of AWB's operating permit in which the "conditions" language had not been stricken.[5] In her declaration, the CO states that on the day after receiving the faxed permit, her office contacted NDEP to determine the status of AWB's permit:

[M]y office contacted the [NDEP] and inquired as to whether AWB possessed a

valid permit because BLM had been provided with a copy of an allegedly valid permit by AWB. We were advised that the permit possessed by AWB was void because of AWB's refusal to accept the conditions of acceptance.

On the same day as this inquiry, April 19, the Area Manager wrote to AWB regarding its faxed permit:

On April 18, 1995, a[sic] Air Quality Permit, AP1442-0187 was received in this office. As your name appears on the permit, I assume it was faxed from your office. My staff has conferred with Don Del Porto, [NDEP]. He advised me that your company does not have a valid Air Quality Permit on file.

Therefore, the decision on April 10, 1995, suspending your contract still stands. Any removal of material during the suspended period will be considered a trespass.

If you have any questions, please contact [the CO]. . . .

On April 20, 1995, Richard Hayes wrote the CO asserting that AWB did have a valid permit. He requested that the agency reconsider its decision to suspend the contracts and indicated that the letter was to be considered "an appeal through the system."

The Area Manager wrote Hayes on May 9, 1995 stating that he had received the April 20 letter and was in the process of forwarding AWB's appeal to the IBLA. In this letter, Morgan informed AWB that the agency had confirmed with NBAQ that AWB did not have a valid air quality permit. On May 10, 1995, BLM forwarded AWB's appeal to the IBLA.

On May 11, 1995, Hayes sent a letter to BLM entitled "Request For Stay." Hayes wrote that the suspension: (1) would cause AWB to cease its operations; (2) was in error and politically motivated; and (3)

4. According to Cynthia Hayes' affidavit, this event happened on April 10, 1995. Defendant alleges that it did not occur until May 2, 1995. In support of its contention, defendant submitted a document entitled "Pahrump Pit Community Activity Log" dated May 2, 1995. Under the section entitled "Remarks," the author of this document merely writes: "Rangers and I put

police line tape across [AWB] pit entrance." The court does not consider this dispute to be material.

5. A copy of this fax was not included in the record before this court.

harmed the public by denying it AWB's competitive pricing.

On June 20, 1995, the State Commission held a hearing on AWB's appeal of the NOAVs. Richard Hayes testified for AWB. During the hearing, Hayes denied NDEP's allegation that he crossed out the "condition" language of the permit. He also denied discussing the validity of the permit in a telephone conversation with NDEP personnel on December 8, 1994. In a bench ruling, however, the State Commission upheld both NOAVs and fined AWB $500 for operating without a valid permit.

Nevertheless, on the following day, NBAQ wrote AWB that it was reissuing the permit: "In order to alleviate the uncertainty as to the validity of the modified permit which was returned to NBAQ, [NBAQ] is hereby reissuing Operating Permit # AP1442–0187 with the appropriate restrictions for the aggregate screening plant. . . ." Hayes signed and returned the permit on June 22, 1995.

Although it is not clear from the materials submitted precisely when BLM was informed that AWB had received a valid permit, on July 3, 1995, Mark R. Chatterton, the BLM Area Manager at the time, wrote the IBLA stating that AWB had come into compliance and requested that the suspension be lifted: "The BLM does not wish to hold up Mr. Hayes from returning to work, but would also like to see a decision in this case. I would like to request that the Board grant Mr. Hayes his request for a stay of the decision issued April 17, 1995, and then issue an opinion at a later date." On that same day, July 3, 1995, the IBLA issued an order granting AWB's request for a stay of BLM's April 10, 1995 order suspending AWB's contracts.

In her declaration, the CO states that after the request for stay was granted, BLM did not pursue a defense to AWB's appeal before the IBLA. According to Ms. Hepworth, "BLM did not submit a written brief, did not attend any hearing that may have been held, and did not present oral argument on the

appropriateness of its suspension or the validity of AWB's permit."

On July 18, 1995, the State Commission issued a written order confirming its prior denial of AWB's appeal of the NOAVs finding that AWB had violated NAC §§ 445B.365 (fugitive air dust) and 445B.287 (operating without an air quality operating permit). In its decision, the State Commission found that "the ink used for Mr. Hayes' signature appeared to be the same ink as that was used for the line through the conditions of acceptance language" of the permit. Additionally, the State Commission found that AWB's phone log revealed that a message was left by an NDEP employee regarding the crossed out language of the permit. AWB did not appeal this decision.

On September 18, 1995, the IBLA issued a decision vacating and remanding [6] the April 10, 1995 suspension order, holding:

[T]he record simply does not support the assertion that appellant was operating without a valid State air quality operating permit at the time of the BLM decision. Despite the presence of a notation dated April 18, 1995, of an ex parte telephone communication from a State Official to the effect that the permit submitted by appellant was not an "approved" permit, the record does not support this assertion. Although appellant received a citation for operating without a permit based on an October 5, 1994, inspection, appellant has tendered a permit signed and dated November 18, 1994, by the Chief, Bureau of Air Quality, State of Nevada.

From the absence of any discussion of the prior determination by the State Commission that AWB did not have a valid permit before or during the suspended period, and from BLM's non-involvement in the IBLA's final determination, the court infers that the IBLA decision was made in ignorance of the facts.

On January 29, 1996, AWB filed a "Demand for Settlement" with BLM requesting payment of damages it incurred as a result of BLM's decision to suspend its contracts.

---

**6.** The IBLA did not state in the decision, nor could defense counsel explain during oral argu- ment, the purpose for the remand.

BLM referred the matter to the Department of Interior's Office of the Solicitor. The Solicitor's Office construed the demand as a claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680 (1994). On June 7, 1996, the Solicitor's Office denied AWB's claim.

Subsequently, AWB filed suit in the United States District Court of Nevada asserting various contract and tort-based claims. That action was voluntarily dismissed so that an action could be brought in this court.

AWB earlier filed a complaint in this court in July 1997 alleging in the first count that BLM breached its contracts with AWB. In the second count, AWB alleged that the agency negligently breached a duty of care owed to the plaintiffs. Ruling on defendant's dispositive motion, we dismissed the negligence cause of action as beyond our jurisdiction. We dismissed the contract cause of action without prejudice because plaintiffs had not submitted a claim pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. § 605(a) (1994). Accordingly, the entire complaint was dismissed for lack of jurisdiction.

On May 18, 1998 AWB filed a claim with the CO pursuant to the CDA seeking profits lost as a result of the alleged wrongful suspension. On July 10, 1998, the CO issued her decision denying AWB's claim: "The facts show that the State of Nevada considered the Air Quality Permit dated November 18, 1994, invalid due to the wrongful actions taken by AWB. BLM did not take wrongful actions in suspending AWB, as AWB was not in compliance with [the Stipulation Agreement] of their Mineral Material Contracts with BLM." On August 27, 1998, plaintiffs filed their current complaint in this court alleging that BLM's actions constitute a breach of contract.

## DISCUSSION

 BLM, at its discretion, had the option of suspending operations if AWB violated any of the provisions of the agreement. When parties to a contract vest one party with the discretion to suspend a contract, this court reviews such action to determine whether the discretion was arbitrarily or ca-

priciously invoked. *See Pacific Far East Line, Inc. v. United States,* 184 Ct.Cl. 169, 184, 394 F.2d 990, 998 (1968); *Thomas Creek Lumber & Log Co. v. United States,* 32 Fed. Cl. 787, 790, *aff'd,* 73 F.3d 379 (Fed.Cir.1995). Under this standard, the court is not permitted to "weigh evidence relating to the agency determination or substitute its judgment for that of the agency, but rather considers whether the agency has 'articulate[d] a rational relationship between the facts found and the choice made.'" *Reservation Ranch v. United States,* 39 Fed.Cl. 696, 715 (1997) (Forest Service finding that harvesting of timber sale in spotted owl habitat would likely jeopardize continued existence of owl was not arbitrary and supported cancellation of timber sale) (quoting *Harris v. United States,* 19 F.3d 1090, 1096 (5th Cir.1994)). Accordingly, the Area Manager's suspension of AWB's operations must be sustained if, under the circumstances, he offered a rational basis for doing so. *See Reservation Ranch,* 39 Fed.Cl. at 715; *Thomas Creek Lumber,* 32 Fed.Cl. at 790.

The Area Manager initiated the suspension at the request of the CO. Prior to the suspension, the CO had received two letters from NBAQ informing her that its inspection of AWB's operations revealed that AWB was operating an aggregate screening plant without a valid permit and creating fugitive dust emissions in violation of state regulations. These letters also stated that NBAQ had issued citations alleging such violations but was unable to serve Richard Hayes with these notices despite numerous attempts. Copies of the inspection report and the citations were included with the March 27, 1995 letter. In addition, as stated in the CO's declaration, her office received a phone call from NBAQ asserting that AWB did not possess a valid permit. Based on this information, the CO requested that the Area Manager issue an order suspending AWB's operations.

The Area Manager's suspension order reveals the relevant facts he relied upon in ordering the suspension. He was thus fully aware of the field inspection performed by NBAQ which provided the basis for the citations. He was also aware not only of the

violations but also that the agency had made unsuccessful attempts to bring AWB into compliance. This information was provided by NDEP—the agency responsible for issuing operating permits and monitoring AWB's operations for conformance with state regulations. There was nothing in the information before the Area Manager that made it suspect or that suggested AWB was in the process of compliance. It was thus reasonable for the Area Manager to rely upon the information provided by NDEP in ordering the suspension.

The suspension was maintained until shortly after AWB complied with state regulations. A review of the information before the Area Manager during this period reveals that the duration of the suspension was also reasonable. Eight days after the suspension began, AWB faxed to the BLM what was apparently a completed, unedited version of the November 18, 1994 permit. In her declaration, however, the CO states that the day after receiving the faxed permit, her office confirmed with NDEP that AWB did not in fact possess a valid permit:

> [M]y office contacted the [NDEP] and inquired as to whether AWB possessed a valid permit because BLM had been provided with a copy of an allegedly valid permit by AWB. We were advised that the permit possessed by AWB was void because of AWB's refusal to accept the conditions of acceptance.

On the same day, the Area Manager wrote AWB stating that his staff had contacted NDEP and confirmed that AWB did not possess a valid permit. Based on this background, the Area Manager continued the suspension until such time as BLM was notified by NDEP that AWB had obtained a valid permit. The Area Manager's decision to maintain the suspension was thus rationally based upon information provided by the only agency qualified to determine whether AWB possessed a valid permit—NDEP.

The Area Manager also acted timely in requesting that the IBLA lift the suspension. Although the actual date that BLM was notified that AWB had come into compliance is not included in the record, the Area Manager requested that the IBLA lift the suspension

only eleven days after AWB acknowledged receipt of the re-issued permit. Considering the time needed for: (1) NDEP to receive an executed permit from AWB; (2) BLM to receive notice from the state agency that AWB had come into compliance; and (3) BLM to prepare a request to the IBLA, eleven days is reasonable.

AWB argues, however, that because the NOAVs issued by NBAQ were only alleged violations, they did not provide the Area Manager with sufficient basis to suspend its operations. AWB has not explained why the NOAVs had to be fully adjudicated before BLM could take action under the contract. Requiring full adjudication of alleged violations prior to suspension would undermine BLM's ability to prevent AWB from continuing harmful conduct during its operations and would render the suspension clause useless.

■ AWB also argues that the IBLA decision vacating the suspension bars, by operation of collateral estoppel, defendant's argument that the suspension was valid. We disagree.

The IBLA holding that BLM wrongfully suspended AWB's operation was based on the premise that AWB possessed a valid permit at the time of the suspension:

> [T]he record simply does not support the assertion that appellant was operating without a valid State air quality operating permit at the time of the BLM decision.... Although appellant received a citation for operating without a permit based on an October 5, 1994, inspection, appellant has tendered a permit signed and dated November 18, 1994, by the Chief, Bureau of Air Quality, State of Nevada.

As explained earlier, this assumption was incorrect. Unbeknownst to the IBLA, what appeared to be a valid permit was an incomplete copy of the annotated "permit" which had been declared invalid by the State Commission. The IBLA's ignorance of the facts is understandable—BLM elected not to participate in the federal appeal process once it had a bench ruling from the state agency. The State Commissions's findings were thus not put before the IBLA.

The court is thus faced with conflicting determinations as to whether AWB was operating with a valid permit at the time of the suspension. Neither agency was acting *ultra vires* and thus both decisions are presumptively entitled to preclusive effect.

Plaintiffs suggest that the stalemate be resolved by having the federal agency's determination trump that of the state. The state decision, however, came earlier in time, and, if the IBLA had been aware of it, presumably would have controlled the result there. In addition, the question of validity *vel non* was more properly within the purview of the state agency. The precise question before the IBLA was whether the suspension was valid.

■ Having the benefit of the State Commission's ruling before us, it is obvious to this court that the IBLA's reliance on the invalid November 18 permit in vacating BLM's suspension order was erroneous. The court will not compound the effects of that error by giving it collateral estoppel effect here when it is so plain that the IBLA, in turn, should have given preclusive effect to the state ruling on validity.[7]

## CONCLUSION

For the reasons stated above, the court concludes that BLM acted reasonably in suspending AWB's operation and continuing the suspension until AWB complied with state regulations. Accordingly, defendant's motion for summary judgment is granted and plaintiffs' motion is denied. The Clerk is directed to dismiss the complaint. No costs.

---

7. Although plaintiffs' general premise that collateral estoppel attaches to final decisions of administrative agencies is correct, *see Astoria Federal Savings and Loan Assoc. v. Solimino*, 501 U.S. 104, 107, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991), there is reason to question its applicability here. Issue preclusion does not attach when the adversely affected party could not seek review of the initial judgment. *See Hartley v. Mentor Corp.*,

869 F.2d 1469, 1472 (Fed.Cir.1989); Restatement (Second) of Judgments § 28(1) (1982). It would appear that BLM has no right to appeal decisions of the IBLA. *See* 43 C.F.R. § 4.403 (1994); 28 U.S.C § 1331 (1994); Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1994); *Aulston v. United States*, 823 F.2d 510, 512 n. 4 (Fed.Cir.1987).